PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 18-1967/1991/1992/2011/2017
_____

PETER BISTRIAN

v.

WARDEN TROY LEVI, FDC Philadelphia; ASSISTANT
WARDEN TRACY BROWN, FDC Philadelphia;
ASSISTANT WARDEN BLACKMAN, FDC Philadelphia;
CAPTAIN DAVID C. KNOX, FDC Philadelphia; JEFFREY
MCLAUGHLIN, Special Investigative Agent, FDC
Philadelphia; DAVID GARRAWAY, Special Investigative
Agent, FDC Philadelphia; LT J. A. GIBBS, FDC
Philadelphia; SENIOR WILLIAM JEZIOR, FDC
Philadelphia; SENIOR OFFICER TIMOTHY BOWNS, FDC
Philadelphia; SENIOR OFFICER MARIBEL BURGOS,
FDC Philadelphia; UNIT MANAGER WHITE, Philadelphia
FDC; LT.  RODGERS, FDC Philadelphia; LT R. WILSON,
Philadelphia FDC; LT DAVID ROBINSON, FDC
Philadelphia; UNITED STATES OF AMERICA

Jeffrey McLaughlin; Timothy Bowns; Maribel Burgos; David
Robinson,
                    Appellants in No. 18-1967

                    Troy Levi,
                    Appellant in No. 18-1991

William Jezior,
            Appellant in No. 18-1992

LT James Gibbs,
            Appellant in 18-2011

Gregory Rodgers,
            Appellant in 18-2017
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-08-cv-03010)
District Judge:  Hon. Cynthia M. Rufe
_____

Argued
September 11, 2018

Before:   JORDAN, RENDELL, and VANASKIE, *Circuit
Judges*

(Filed December 28, 2018)
_____

Benjamin N. Gialloreto
Law Offices of Richard Stoloff
1500 John F. Kennedy Blvd. - #520
Philadelphia, PA   19102
        *Counsel for Appellant Troy Levi*

Carlton L. Johnson
Jeffrey M. Scott   [ARGUED]
Shelley R. Smith
Archer & Greiner
Three Logan Square
1717 Arch St. - #3500
Philadelphia, PA   19103
      *Counsel for Appellants Jeffrey McLauglin,*
      *Timothy Bowns, Maribel Burgos, David Robinson*

Genelle P. Franklin
Fridie Law Group
101 Route 130 South - #9
Cinnaminson, NJ   08077
      *Counsel for Appellant Lt. Rodgers*

Gary L. Bailey
Syreeta J. Moore
Bailey & Associates
1500 Walnut St. - #821
Philadelphia, PA   19102
      *Counsel for Appellant J.A. Gibbs*

Kay Kyungsun Yu
Aleena Y. Sorathia
Ahmad Aaffarese
Joseph E. Zaffarese
One South Broad St. - #1810
Philadelphia, PA   19107
      *Counsel for Appellant William Jezior*

Richard L. Bazelon   [ARGUED]
Michael F. Harris
Bazelon Less & Feldman
One South Broad St. - #1500
Philadelphia, PA   19107

Robert E. Goldman
535 Hamilton St. - #302
Allentown, PA   18101
        *Counsel for Appellee*

Jonathan H. Feinberg
Kairys Rudovsky Messing & Feinberg
718 Arth St. – #501 South
Philadelphia, PA   19106

Bruce P. Merenstein
Schnader Harrison Segal & Lewis
1600 Market St. - #3600
Philadelphia, PA   19103

Mary Catherine Roper
American Civil Liberties Union of Pennsylvania
P.O. Box 60173
Philadelphia, PA   19106
        *Counsel for Amicus, American Civil Liberties Union*

_____

OPINION OF THE COURT

_____

4

JORDAN, *Circuit Judge*.

Peter Bistrian, a detainee at the Federal Detention Center ("FDC") in Philadelphia, brought suit against prison officials there. He alleges that they failed to protect him from other prisoners and punitively detained him in the FDC's Special Housing Unit ("SHU").[1] The District Court granted qualified immunity to some defendants on some claims, but denied summary judgment on Bistrian's constitutional claims, which were brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). For the reasons that follow, we will affirm in part and reverse in part.

---

[1] The SHU is a segregated housing unit where inmates may be placed for either administrative or disciplinary reasons. Inmates are confined in solitary or near-solitary conditions in a "six by eight foot cell for 23 to 24 hours a day, with little or no opportunity to interact with other inmates[.]" (App. at 2923 ¶ 12.)

## I.   FACTUAL BACKGROUND[2]

From August 2005 until March 2008, Bistrian was a detainee at the FDC while he awaited trial, was tried, convicted, and finally sentenced on charges related to wire fraud. During that time, prison officials placed him in the SHU on four occasions.

They first placed him in the SHU on November 18, 2005, following allegations that he had violated telephone use rules. He stayed there for approximately seven weeks, until January 9, 2006. Three weeks later, on January 25, 2006, prison officials again put him in the SHU, this time because of "[s]ecurity [c]oncerns."[3] (App. at 94.) He remained there for nearly a year, from January 25, 2006, to December 8, 2006.

During that second round of intensive detention, Bistrian earned some privileges and became an orderly, a prison job that provided him the opportunity to interact with other inmates housed in the SHU. Knowing of Bistrian's

[2] In assessing an assertion of qualified immunity, we take the facts in the light most favorable to "the party asserting the injury," which here is Bistrian. *Scott v. Harris*, 550 U.S. 372, 377 (2007).

[3] What those concerns were is not in the record. In February 2006, the Warden was informed that there was no detention order for Bistrian's then current detention in the SHU. Months later, in July, a prison official completed a detention order, noting that Bistrian was being detained for "[s]ecurity [c]oncerns." (App. at 94.)

access to others in the SHU, a fellow inmate, Steven Northington, asked him to pass notes between inmates. In particular, Northington wanted to facilitate communication for another prisoner, his friend and criminal confederate Kaboni Savage.[4] Bistrian told Officers Gibbs and Bowns of that request, rightfully believing they would be interested. That led to the formation of a surveillance operation in which Bistrian secretly passed inmate notes to prison officials. Prison officials photocopied the notes, and gave Bistrian the original to pass along. All went as planned until Bistrian accidentally gave a photocopy of a note, instead of the original, to an inmate, thereby tipping off the SHU's residents to Bistrian's cooperation with prison officials. After his cooperation became known, he received multiple threats and made prison officials aware of them, including defendants Bowns, Gibbs, Jezior, and Warden Levi.

Despite their knowledge of the threats against Bistrian, on June 30, 2006, prison officials placed him in the recreation yard where Northington and two other inmates were also present. In what, for ease of reference, we will call "the Northington attack," Northington and the two others proceeded to brutally beat Bistrian. Jezior and other officials yelled for the attack to stop, but they did not enter the yard. Instead, they waited until a larger number of guards (12 to 15) were present to intervene. By then, the damage was done. Bistrian suffered severe physical and psychological injuries,

---

[4] Northington and Savage were part of a Philadelphia drug gang and involved in witness intimidation, death threats to witnesses and law enforcement, and a firebombing that killed six family members of the government's chief cooperating witness.

and that is the basis of his claim under the Fifth Amendment that the prison officials failed to protect him.[5]

In December 2006, less than a month after Bistrian had completed his nearly yearlong second detention, prison officials again placed him in the SHU. They cited his safety as the reason for doing so. According to the defendants, there had been death threats against him. Shortly after that placement, Bistrian's counsel sent a letter to Warden Levi asking why his client was there. The Warden replied that records indicated it was due to an investigation. Bistrian was released two days after that response, having spent approximately a month in the SHU.

In August 2007, at a sentencing hearing, Bistrian objected to his treatment in prison and the time and circumstances of his administrative detentions. After the hearing, the government provided Bistrian's counsel with evidence of the telephone infractions they relied on as the justification for Bistrian's confinement in the SHU. That prompted an email exchange in which Bistrian's counsel asked for an explanation of how Bistrian had violated prison policies. Counsel for the government promptly forwarded that request to the FDC.

Two days after Bistrian's counsel pressed for an explanation, Bistrian was put in the SHU for the fourth time.

---

[5] On October 12, 2006, Bistrian was again attacked in the recreation yard. The attacker on that occasion, however, suffered from mental illness and was not known to be associated with Savage or Northington. Bistrian does not contend that that event is relevant to any issue on appeal.

Officer Jezior wrote an incident report stating that Bistrian had again violated telephone use rules.[6] Using available administrative procedures, Bistrian contested the placement but his grievance and appeal were denied. Bistrian alleges that, after Warden Levi denied the appeal, the Warden said Bistrian "would never see the light of day again." (App. at 22 (citation omitted).) Bistrian was in the SHU for about three months, until early December 2007. That final stay forms the basis of his First Amendment retaliation claim and his Fifth Amendment punitive detention claim.

Bistrian was ultimately sentenced to 57 months' imprisonment and sent to a correctional facility in New York.

## II. PROCEDURAL BACKGROUND

This lawsuit began over a decade ago. The operative pleading is an amended complaint asserting various First, Fifth, and Eighth Amendment claims against FDC prison officials and medical staff, and claims under the Federal Tort Claims Act ("FTCA") against the United States. The defendants filed motions to dismiss all nineteen claims in the amended complaint, saying there had been a failure to exhaust administrative remedies and a failure to plead sufficient facts to overcome the defense of qualified immunity. *Bistrian v. Levi*, Civ. No. 08-3010, 2010 WL 3155267, at *4-7 (E.D. Pa. July 29, 2010). The District Court granted those motions in part. *Id.* at *1. It dismissed thirteen claims but found that six were sufficiently pled to survive

---

[6] The relevant detention order, however, stated that Bistrian was placed in the SHU "pending investigation of a violation of [Bureau] regulations." (App. at 131.)

dismissal, including Bistrian's *Bivens* claims for violations of the First Amendment and Fifth Amendment. *Id.* at \*1.

The defendants involved in this appeal, with others, then asked us to review the District Court's denial of their assertion of qualified immunity. *Bistrian v. Levi*, 696 F.3d 352, 364-65 (3d Cir. 2012) (*Bistrian II*). We affirmed in part, but dismissed the claims against some defendants and limited the *Bivens* claims to a Fifth Amendment procedural due process claim, a Fifth Amendment substantive due process claim for failure to protect and another for punitive detention, and a First Amendment claim for retaliation.[7] *Id.* at 377. In doing so, we set forth the legal standards governing the claims we permitted to proceed. *Id.* at 366-68, 372-76.

Following remand and years of extensive discovery, the remaining defendants filed motions for summary judgment, which the District Court granted in part and denied in part. *Bistrian v. Levi*, 299 F. Supp. 3d 686, 713 (E.D. Pa. 2018) (*Bistrian III*). It granted summary judgment in favor of all defendants on the Fifth Amendment procedural due process claim because Bistrian had had the opportunity to

---

[7] We concluded that only certain periods of confinement in the SHU could give rise to plausible retaliation or punitive detention claims, excluding the periods Bistrian was actively engaged in the note-passing operation. *Bistrian II*, 696 F.3d at 374-75. We reasoned that the defendants reasonably confined Bistrian to the SHU for his own safety during that time. *Id.*

10

challenge each SHU confinement.[8]  *Id.* at 707-10.  It denied summary judgment on the other three *Bivens* claims, concluding that they were based on clearly established rights at the time of the alleged violations, making the defense of qualified immunity inapplicable.  *Id.* at 702, 707, 711-12. Those three claims survived, however, only against certain defendants.  *Id.*

More specifically, the District Court granted summary judgment for five defendants on Bistrian's Fifth Amendment failure-to-protect claim, but it denied summary judgment for the eight defendants who bring this appeal.  *Id.* at 700-02.  It decided that there were material issues of fact as to whether those eight "were deliberately indifferent to the substantial risk to [Bistrian's] safety[,]" *id.* at 700, and it highlighted evidence that it said could lead a reasonable jury to conclude that "Bergos [sic], Bowns, Gibbs, Jezior, Levi, McLaughlin, Robinson, and Rodgers knew of the note-passing scheme and were aware of the risk [Bistrian] faced once his cooperation … was discovered."[9]  *Id.*  Because the right to be protected

---

[8]  The dismissal of the Fifth Amendment procedural due process claim is not challenged on appeal.  Additionally, the United States filed a motion for summary judgment on the FTCA claims that was granted in part and denied in part.  The United States, however, is not a party to this appeal, and, thus, we do not address those claims.

[9]  In particular, the District Court observed that, despite whatever protection the officials provided Bistrian by discontinuing his orderly duties, they "did not take action to prevent [him] from encountering Northington in the recreation area."  *Bistrian III*, 299 F. Supp. 3d at 701.  The

11

against prisoner-on-prisoner violence was already clearly established, the Court said, qualified immunity did not apply. *Id.* at 702.

As to Bistrian's Fifth Amendment punitive detention claim, the District Court granted summary judgment for all defendants except Levi and Jezior. *Id.* at 706. It determined that a genuine dispute of material fact existed "regarding whether [in sending Bistrian to the SHU for the fourth time] Jezior and Levi expressly intended to punish him for his protests to the Court[.]" *Id.* at 706. The Court relied on the timing of Jezior's incident report leading to the fourth confinement, as well as Levi's purported statement that Bistrian "would never see the light of day again[.]" *Id.* Qualified immunity, again, was not available because the right to be free from punitive detention was already clearly established at the time. *Id.* at 707.

So too, the First Amendment retaliation claim was allowed to proceed against Levi and Jezior. *Id.* at 710-11. The District Court determined that Bistrian's challenge to his SHU confinements was a protected activity and that his fourth assignment to the SHU could be seen as a retaliatory and adverse action taken by Jezior and Levi, given the "suggestive temporal proximity" of Jezior's incident report and the obvious import of the "never see the light of day"

---

Court reasoned that Bistrian had "put forth evidence showing that he was incarcerated under conditions posing a substantial risk of serious harm[,]" given his proximity to members of the Savage-Northington gang after they discovered the note-passing scheme. *Id.* at 700-01.

12

comment that Levi allegedly made. *Id.* Once again, qualified immunity was not justified, the Court said, because the right against retaliation was clearly established at the time. *Id.* at 711-12.

Following the District Court's summary judgment ruling, the eight defendants before us now filed their timely interlocutory appeals, which have been consolidated for review.

## III.   JURISDICTION[10]

"[W]e normally do not entertain appeals from a district court order denying a motion for summary judgment because such orders do not put an end to the litigation." *Rivas v. City of Passaic*, 365 F.3d 181, 191 (3d Cir. 2004). That holds true when the district court denies qualified immunity based on a determination that material facts remain in dispute. *Id.* We can, however, entertain appeals based on a denial of "a defendant's motion for summary judgment so long as: (1) the defendant is a public official asserting a qualified immunity defense; and (2) the issue on appeal is whether the facts alleged by the plaintiff demonstrate a violation of clearly established federal law, not which facts the plaintiff might be able to prove at trial." *Id.* (emphasis omitted) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985)). In other words, we cannot review a decision in which the only question relates to "evidence sufficiency" in the sense of what facts can be

---

[10] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343.

13

proven.[11] *See Vanderklok v. United States*, 868 F.3d 189, 196 (3d Cir. 2017).

Some of the defendants' arguments raise factual issues and so are outside our jurisdiction on this interlocutory appeal.[12] But the defendants also challenge whether the

---

[11] Use of the phrase "evidence sufficiency" here does not indicate that an appellant cannot challenge whether the undisputed evidence supports a finding of qualified immunity. That is a legal question over which we may exercise jurisdiction. We use the phrase as did the Supreme Court when it said that "a question of 'evidence sufficiency,' i.e., which facts a party may, or may not, be able to prove at trial" is not an appealable final order. *Johnson v. Jones*, 515 U.S. 304, 313 (1995); *see also Montanez v. Thompson*, 603 F.3d 243, 248 (3d Cir. 2010), *as amended* (May 25, 2010) ("The Supreme Court has made clear, however, that this qualified immunity exception does not include interlocutory appeals of a district court's evidence sufficiency determinations at summary judgment.").

[12] For example, Warden Levi contends the District Court erred because there was insufficient evidence of officers' awareness of a substantial risk of serious harm to Bistrian from inmate-on-inmate violence. That is not appealable at this stage because Levi's argument is based on the District Court's conclusion that Bistrian had evidence of a fact that he may prove at trial, specifically he had "pointed to evidence showing that [some officials] knew of the note-passing scheme and were aware of the risk [Bistrian] faced[.]" *Bistrian III*, 299 F. Supp. 3d at 701.

District Court properly applied principles of qualified immunity in denying summary judgment on the three *Bivens* actions. Those arguments involve only questions of law, including whether the rights in question were clearly established. *Id.* at 197. "And since the issue of whether a [*Bivens*] cause of action even exists … is a threshold question of law, we have jurisdiction to consider that as well." *Id.* Accordingly, what follows is a review of the dispositive legal questions raised by the qualified immunity defenses to Bistrian's claims for failure to protect and punitive detention under the Fifth Amendment, and for retaliation under the First Amendment.

## IV.   DISCUSSION

---

The defendants also challenge the District Court's qualified immunity analysis because, they say, as a matter of law, the Court failed to engage in a sufficiently particularized analysis with regard to each claim and each defendant. The District Court's ruling, however, resulted in denying summary judgment as to certain defendants on certain claims and granting summary judgment to other defendants on other claims. The Court could not have conducted a one-size-fits-all analysis because it reached different conclusions as to different defendants on each of the claims it let proceed. There was a sufficiently particularized analysis, and, we agree with Bistrian that the defendants' attempts to argue that the District Court erred as a matter of law are nothing more than "a disguised insufficiency of the evidence contention." (Bistrian Answering Br. I at 25.)

15

As we will explain, Bistrian has a cognizable *Bivens* cause of action for the alleged failure of the defendants to protect him from a substantial risk of serious injury at the hands of other inmates. The prisoner-on-prisoner violence is not a new context for *Bivens* claims, and no special factors counsel against allowing a failure-to-protect cause of action. We will therefore affirm the District Court's denial of summary judgment with respect to that claim. We must, however, reverse the denial of summary judgment on Bistrian's claims for punitive detention and retaliation because they are novel and special factors counsel against extending *Bivens* coverage to such claims.

## A.  Waiver

Before turning to the merits, though, there is a preliminary question: whether the defendants waived their arguments against the availability of *Bivens* claims.[13]  *Bivens* is the short-hand name given to causes of action against federal officials for alleged constitutional violations. In the

---

[13]  While "waiver" is defined as a "voluntary relinquishment or abandonment … of a legal right or advantage[,]" we recognize that the term "waiver" is used loosely to refer to the loss of the right to challenge a ruling on appeal due to failure to object at trial or to otherwise sufficiently raise an argument in the trial court. Waiver, Black's Law Dictionary (10th ed. 2014). We would be more precise if we used the term "forfeiture," Forfeiture, Black's Law Dictionary (10th ed. 2014), but, in light of the historical use of the term waiver with respect to the forfeiture of arguments, we use it throughout this opinion.

eponymous case, the Supreme Court considered whether a "violation of [the Fourth Amendment] by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct." *Bivens*, 403 U.S. at 389. The Court held that such a claim was cognizable and that the plaintiff was "entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the [Fourth] Amendment." *Id.* at 397. Thus was born an implied right of action to recover damages against federal officials for constitutional violations.

Prior to the present appeal, none of the eight defendants before us challenged the existence of a *Bivens* cause of action for failure to protect or for punitive detention, and only two of the defendants, Levi and Jezior, questioned the existence of a retaliation claim, and they did so only in passing.[14] Bistrian thus argues that the defendants have waived their right to challenge the availability of a *Bivens* remedy. We conclude, however, that the cognizability of the *Bivens* claims is a question inherent in the qualified immunity defenses. To rule otherwise would be to allow new causes of action to spring into existence merely through the dereliction of a party.

Whether a *Bivens* claim exists in a particular context is "antecedent to the other questions presented." *Hernandez v.*

---

[14] The existence of a *Bivens* retaliation claim was raised by Jezior and Levi in one sentence in a motion-to-dismiss reply brief and one sentence in the summary-judgment briefing.

17

*Mesa*, 137 S. Ct. 2003, 2006 (2017) (citation omitted). It is thus "a threshold question of law" that "is directly implicated by the defense of qualified immunity[.]" *Vanderklok*, 868 F.3d at 197 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 549 n.4 (2007)). We can sometimes resolve a case by demonstrating that a plaintiff would lose on the constitutional claim he raises, even if *Bivens* provided a remedy for that type of claim.[15] *See Hernandez*, 137 S. Ct. at 2007 (approving "dispos[al] of a *Bivens* claim by resolving the constitutional question, while assuming the existence of a *Bivens* remedy"). But threshold questions are called that for a reason, and it will often be best to tackle head on whether *Bivens* provides a remedy, when that is unsettled. *See id.* at 2006-07 (remanding case to court of appeals to address existence of *Bivens* cause of action in first instance).

That is true whether the parties raise the question or not. Assuming the existence of a *Bivens* cause of action—without deciding the issue—can risk needless expenditure of the parties' and the courts' time and resources. Thus, even when a defendant does not raise the issue of whether a *Bivens* remedy exists for a particular constitutional violation, we may still consider the issue in the interest of justice. *See Carlson v. Green*, 446 U.S. 14, 17 n.2 (1980) (concluding "that the interests of judicial administration w[ould] be served by

---

[15] "Whether a cause of action exists is not a question of jurisdiction, and may be assumed without being decided." *Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 523 n.3 (1991). Accordingly, the fact that a *Bivens* action might not exist does not deprive this Court of jurisdiction to resolve the issues raised.

addressing" the existence of a *Bivens* cause of action even though the issue was "not presented below").

Accordingly, we consider whether a *Bivens* cause of action exists for each claim at issue here.

## B. *Bivens* Analysis

"[F]or decades, the Supreme Court has repeatedly refused to extend *Bivens* actions beyond the specific clauses of the specific amendments [of the Constitution] for which a cause of action has already been implied, or even to other classes of defendants facing liability under those same clauses." *Vanderklok*, 868 F.3d at 200. The Supreme Court's recent opinion in *Ziglar v. Abbasi* said bluntly "that expanding the *Bivens* remedy is now a 'disfavored' judicial activity[,]" but it noted that *Bivens* actions have been recognized in three contexts. 137 S. Ct. 1843, 1855, 1857 (2017) (citation omitted). First, as mentioned earlier, in the *Bivens* case itself the Court recognized an implied cause of action for violations of the Fourth Amendment's right against unreasonable searches and seizures. 403 U.S. at 397. In the following decade, the Court recognized two other *Bivens* actions: one under the Fifth Amendment's Due Process Clause for gender discrimination in the employment context, *Davis v. Passman*, 442 U.S. 228, 248-49 (1979), and another under the Eighth Amendment's Cruel and Unusual Punishments Clause for inadequate prison medical care, *Carlson*, 446 U.S. at 23-25.[16]

---

[16] In *Abbasi*, the Supreme Court suggested that its analysis for those three recognized *Bivens* remedies "might

19

Indicating concern about any further expansion of implied rights, the Court in *Abbasi* "established a rigorous inquiry" to determine whether a *Bivens* cause of action should be recognized in a new context. *Vanderklok*, 868 F.3d at 200. First, courts must determine whether a case presents "a new *Bivens* context[,]" by asking whether or not the case "is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court[.]" *Abbasi*, 137 S. Ct. at 1859. Examples of potentially meaningful differences include "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; [and] the risk of disruptive intrusion by the Judiciary into the functioning of other branches[.]" *Id.* at 1860.

If the case does present an extension of *Bivens* into a new context, we turn to the second step of *Abbasi* and ask whether any "special factors counsel[] hesitation" in permitting the extension. *Id.* at 1857. There may be many such factors, but two are particularly weighty: the existence of an alternative remedial structure and separation-of-powers principles. *Id.* at 1857-58. The first factor – whether an alternative remedial structure is available – may by itself "limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.* at 1858. And any time the second factor –

have been different if they were decided today." 137 S. Ct. at 1856.

separation-of-powers principles – is in play, that "should be central to the analysis." *Id.* at 1857. The Court noted other special factors that could be considered, including: the potential cost to the government of recognizing a private cause of action, both financially and administratively; whether the judiciary is well suited to weigh those costs; the necessity to deter future violations; whether Congress has already acted in that arena, suggesting it does not "want the Judiciary to interfere"; whether a claim addresses individual conduct or a broader policy question; whether litigation would intrude on the function of other branches of government; and whether national security is at stake. *Id.* at 1856-63.

### 1. *"Failure to Protect" Under the Fifth Amendment*

Contrary to the opposition of some of the defendants,[17] an inmate's claim that prison officials violated his Fifth Amendment rights by failing to protect him against a known risk of substantial harm does not present a new *Bivens* context. On the contrary, we recognized just such a claim 45 years ago in *Curtis v. Everette*. 489 F.2d 516, 518-19 (3d Cir. 1973) (recognizing constitutional due process right for prisoner to be free from violent attack by fellow prisoner). Moreover, the Supreme Court ratified that kind of claim some 20 years later in *Farmer v. Brennan*, 511 U.S. 825, 832-49 (1994), and we recently concluded, in *Bistrian II,* that a

---

[17] Although the defendants did not challenge the existence of a *Bivens* remedy for Bistrian's failure-to-protect claim in the District Court, two defendants, Officers Gibbs and Rodgers raised it in their opening briefs on appeal.

pretrial detainee "ha[s] a clearly established constitutional right to have prison officials protect him from inmate violence[,]" 696 F.3d at 367.

Farmer is of greatest significance. In that case, the Court assessed a "failure to protect" claim brought under the Eighth Amendment and *Bivens* as a result of prisoner-on-prisoner violence. 511 U.S. at 829-34. Although the *Farmer* Court did not explicitly state that it was recognizing a *Bivens* claim, it not only vacated the grant of summary judgment in favor of the prison officials but also discussed at length "deliberate indifference" as the legal standard to assess a *Bivens* claim, the standard by which all subsequent prisoner safety claims have been assessed. *Id.* at 832-49. It seems clear, then, that the Supreme Court has, pursuant to *Bivens*, recognized a failure-to-protect claim under the Eighth Amendment.[18] *See Doty v. Hollingsworth*, Civ. No. 15-3016, 2018 WL 1509082, at \*3 (D.N.J. Mar. 27, 2018) (holding that an Eighth Amendment failure-to-protect claim premised on

---

[18] Counsel for the defendants seemed to admit as much at oral argument: "[Counsel:] In *Farmer v. Brennan*, the Supreme Court seemed to have implied a cause of action and then went and started to talk about a failure-to-protect claim and what would be the culpability level of an official. [The Court:] So why doesn't *Farmer vs. Brennan* say there is … a *Bivens* action under the Fifth Amendment for failure to protect, that's what *Farmer v. Brennan* is all about? [Counsel:] It is." (Oral Arg. Tr. at 5:36-6:01.) And, some defendants' briefs analyzed Bistrain's claim under the *Farmer* framework.

22

inmate-on-inmate violence is not a new context given sufficient similarity to both *Carlson* and *Farmer*).

Abbasi does not contradict that reasoning. It is true that *Abbasi* identified three *Bivens* contexts and did not address, or otherwise cite to, *Farmer*. 137 S. Ct. at 1854-55. But we decline to "conclude [that the Supreme Court's] more recent cases have, by implication, overruled an earlier precedent." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). It may be that the Court simply viewed the failure-to-protect claim as not distinct from the Eighth Amendment deliberate indifference claim in the medical context. *Farmer* continues to be the case that most directly deals with whether a *Bivens* remedy is available for a failure-to-protect claim resulting in physical injury. 137 S. Ct. at 832-34.

As in *Farmer*, Bistrian seeks a remedy against prison officials for their failure to protect him from prisoner-on-prisoner violence. *Id.* Bistrian's claim, however, arises under the Fifth Amendment, not the Eighth Amendment, because he was a pretrial detainee at the time of the Northington Attack.[19] But that does not warrant the conclusion that, in applying *Bivens* to a pretrial detainee's claim under the Fifth Amendment as opposed to a post-conviction prisoner's claim under the Eighth Amendment, we would be extending *Bivens*

---

[19] "Pretrial detainees are not within the ambit of the Eighth Amendment but are entitled to the protections of the Due Process clause." *Kost v. Kozakiewicz*, 1 F.3d 176, 188 (3d. Cir. 1993) (citation omitted). The Fifth Amendment protects pretrial detainees, while the Eighth Amendment protects post-trial convicts. *Id.*

to a new context.  Indeed, *Farmer* practically dictates our ruling today because it is a given that the Fifth Amendment provides the same, if not more, protection for pretrial detainees than the Eighth Amendment does for imprisoned convicts.[20]  *Kost v. Kozakiewicz*, 1 F.3d 176, 188 n.10 (3d. Cir. 1993) ("Pretrial detainees … are entitled to at least as much protection as convicted prisoners, so the protections of the Eighth Amendment would seem to establish a floor of sorts.").  Accordingly, although Bistrian's claim derives from a different Amendment, it is not "different in a meaningful way" from the claim at issue in *Farmer*.  *Abbasi*, 137 S. Ct. at 1859.  The failure-to-protect claim here thus does not call for any extension of *Bivens*.

The defendants ignore *Farmer* and urge that not only would allowance of this claim impermissibly extend *Bivens*, but there are special factors that counsel against such an extension.  Since we conclude a failure-to-protect claim does not present a new context, there is no need to address the second step and consider special factors.  *See Abbasi*, 137 S. Ct. at 1860 (observing that if the case presents a new *Bivens* context, "a special factors analysis [is] required before allowing [the] damages suit to proceed").  Even if there were such a need, however, the factors the defendants point to— namely, first, the existence of alternative remedial structures, second, the implication of the passage of the PLRA, and third, separation of powers principles—are unpersuasive, given the weight and clarity of relevant Supreme Court precedent.

---

[20] Defendant Gibbs admitted that "[t]he Due Process Clause affords Bistrian the same protection as the Eight Amendment's Cruel and Unusual Punishment Clause." (Gibbs Opening Br. at 19.)

24

First, the existence of an FTCA remedy does not foreclose an analogous remedy under *Bivens*. According to the Supreme Court, it is "crystal clear that Congress intended the FTCA and *Bivens* to serve as parallel and complementary sources of liability." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) (citation omitted). For example, in *Carlson*, the Supreme Court specifically noted that a "*Bivens* remedy … is a more effective deterrent than the FTCA" because it "is recoverable against individuals[.]" 446 U.S. at 21. The Court continued by saying that the "FTCA is not a sufficient protector of the citizens' constitutional rights, and without a clear congressional mandate we cannot hold that Congress relegated [prisoners] exclusively to the FTCA remedy." *Id.* at 23; *see also Bush v. Lucas*, 462 U.S. 367, 378 (1983) ("No statute expressly declared the FTCA remedy to be a substitute for a *Bivens* action.").

If that precedent were not enough, the FTCA itself appears to recognize the complementary existence of *Bivens* actions by creating an exception for suits against individual federal officers for constitutional violations. *See Vanderklok*, 868 F.3d at 201 (stating that the FTCA, in 28 U.S.C. § 2679(b)(2)(A), "notes that a *Bivens* action itself is available."). So the prospect of relief under the FTCA is plainly not a special factor counseling hesitation in allowing a *Bivens* remedy. *Id.*

The defendants argue that two other remedial routes were available to Bistrian, namely, the prison administrative grievance process and a petition for a writ of habeas corpus. But neither of those should prevent the availability of *Bivens* because they cannot redress Bistrian's alleged harm. Like

25

*Bivens*, this is a case where "it is damages or nothing." *Abbasi*, 137 S. Ct. at 1862 (citation omitted). The beating that Bistrian took in the prison yard was allegedly the result of "individual instances of [official misconduct], which due to their very nature are difficult to address except by way of damages actions after the fact." *Id.* The administrative grievance process is not an alternative because it does not redress Bistrian's harm, which could only be remedied by money damages. *See Nyhuis v. Reno*, 204 F.3d 65, 70 (3d Cir. 2000) (observing that money damages are "not available under the Bureau of Prisons' administrative process." (citations omitted)). Similarly, a habeas petition would not address Bistrian's harms, because it too gives no retrospective relief. *Preiser v. Rodriguez*, 411 U.S. 475, 494 (1973) (observing that habeas relief does not provide for damages). Accordingly, there are no true alternative remedies counseling against allowing a *Bivens* remedy for a Fifth Amendment claim based on a failure to protect.

Next, the defendants argue that congressional silence in the PLRA about the availability of *Bivens* remedies is evidence of an intent that there be none. That silence, however, does not bear the meaning the defendants ascribe to it. The PLRA was enacted "to eliminate unwarranted federal-court interference with the administration of prisons" and "to reduce the quantity and improve the quality of prisoner suits."[21]  *Woodford v. Ngo*, 548 U.S. 81, 93-94 (2006)

---

[21]  *Abbasi* discussed the impact of the PLRA's enactment, noting that it "made comprehensive changes to the way prisoner abuse claims must be brought in federal court." 137 S. Ct. at 1865.

26

(citation omitted). Therefore, the PLRA reflects Congress's intent to make more rigorous the process prisoners must follow to bring suit in federal court. And, of dispositive note, the PLRA has been interpreted to govern the process by which federal prisoners bring *Bivens* claims. *Nyhuis v. Reno*, 204 F.3d 65, 68-69 (3d Cir. 2000); *see also Abbasi*, 137 S. Ct. at 1865 ("This Court has said in dicta that the [PLRA's] exhaustion provisions would apply to *Bivens* suits."). The very statute that regulates how *Bivens* actions are brought cannot rightly be seen as dictating that a *Bivens* cause of action should not exist at all.[22]

Finally, the defendants argue that separation-of-powers principles counsel against providing a *Bivens* remedy in suits like this. It is true that *Bivens* is not the "proper vehicle for altering an entity's policy" and that "[t]he purpose of *Bivens* is to deter the *officer*." *Abbasi*, 137 S. Ct. at 1860 (citations omitted). Hence, in *Abbasi*, a *Bivens* claim was not allowed where the plaintiffs challenged "the formal policy adopted by … Executive Officials" imposing restrictive housing conditions. *Id.* at 1858, 1860. Here, however, Bistrian's claim challenges particular individuals' actions or inaction in a particular incident – the specific decision to place him in the yard with Northington and other prisoners and then to not

---

[22] "It could be argued that [silence in the PLRA] suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Abbasi*, 137 S. Ct. at 1865. It is equally, if not more, likely, however, that Congress simply wanted to reduce the volume of prisoner suits by imposing exhaustion requirements, rather to eliminate whole categories of claims through silence and implication.

intervene when he was being savagely beaten. Addressing that incident will, it is true, unavoidably implicate "policies regarding inmate safety and security[,]" (*e.g.*, Gibbs Opening Br. at 18-19,) but that would be true of practically all claims arising in a prison. *Cf. Pell v. Procunier*, 417 U.S. 817, 823 (1974) ("[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves."). *Farmer* shows that that alone cannot be a complete barrier to *Bivens* liability, because "gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objectiv[e.]" 511 U.S. at 833-34 (citation omitted) (setting the "deliberate indifference" standard to ensure that prison officials do not forgo their responsibility "to protect prisoners from violence at the hands of other prisoners"); *see, e.g.*, *Benefield v. McDowall*, 241 F.3d 1267, 1270-71 (10th Cir. 2001) (implementing the standard from *Farmer* for a *Bivens* failure-to-protect claim). Bistrian's claim fits squarely within *Bivens*' purpose of deterring misconduct by prison officials. And, since failure-to-protect claims have been allowed for many years, there is no good reason to fear that allowing Bistrian's claim will unduly affect the independence of the executive branch in setting and administering prison policies.

In sum, a special factors analysis does not counsel hesitation, and the District Court correctly denied the defendants' motion for summary judgment with respect to Bistrian's failure-to-protect claim. As we previously concluded, "Bistrian—as an inmate who at all relevant times was either not yet convicted or convicted but not yet sentenced—had a clearly established constitutional right to have prison officials protect him from inmate violence." *Bistrian II*, 696 F.3d at 367. That conclusion was based on a

28

right that was recognized in *Farmer* and not overruled by *Abbasi*, and thus a right that remains clearly established. *See Agostini,* 521 U.S. at 237 (declining to "conclude [that the Supreme Court's] more recent cases have, by implication, overruled an earlier precedent."). *Abbasi* changed the framework of analysis for *Bivens* claims generally, but not the existence of the particular right to *Bivens* relief for prisoner-on-prisoner violence.

### 2. *Punitive Detention Under the Fifth Amendment*

Bistrian's claim for damages for punitive detention is a different matter altogether. Unlike the failure-to-protect claim, the punitive-detention claim does amount to an extension of *Bivens* into a new context, and special factors do counsel against creating a new *Bivens* remedy in that context, so we hold there is no *Bivens* cause of action for that alleged violation of the Fifth Amendment.

Citing *Carlson* and *Davis*, Bistrian argues that his punitive-detention claim is not really a *Bivens* novelty because the Supreme Court has "expressly extended *Bivens* both to the Fifth Amendment, … and to the prison context[.]" (Bistrian Answering Br. II at 26 (citations omitted).) That does not hold water. *Abbasi* expressly warns that, even if there are "significant parallels to one of the Court's previous *Bivens* cases," "a modest extension is still an extension." 137 S. Ct. at 1864. Neither *Carlson* nor *Davis* addressed a constitutional right against punitive detention, and that alone warrants recognizing this as a new context.

29

Turning to *Abbasi*'s second step, the special factors analysis counsels against extending *Bivens* to provide a remedy for punitive detention. Unlike Bistrian's failure-to-protect claim, which relates to a specific and isolated event, a punitive-detention claim more fully calls in question broad policies pertaining to the reasoning, manner, and extent of prison discipline. The warden and other prison officials have—and indeed must have—the authority to determine detention policies, to assess the endless variety of circumstances in which those policies may be implicated, and to decide when administrative detention is deserved and for how long. *See Sandin v. Conner*, 515 U.S. 472, 482 (1995) (observing, in the § 1983 context, that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile [prison] environment" and thus should limit "the involvement of federal courts in the day-to-day management of prisons"). Detention policies and their application cannot be helpfully reviewed as *Bivens* claims. "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform" because the problems "are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree." *Turner v. Safley*, 482 U.S. 78, 84 (1987) (citation omitted). The Bureau of Prisons, not the judiciary, has the "expertise, planning, and the commitment of resources" necessary for the difficult task of running a correctional facility. *Id.* at 84-85. Consequently, the task of prison administration "has been committed to the responsibility of [the legislative and executive] branches, and separation-of-powers concerns counsel a policy of judicial restraint." *Id.* at 85. Ruling on administrative detention

policy matters would unduly encroach on the executive's domain.[23] *See Wetzel v. Edwards*, 635 F.2d 283, 288 (4th Cir. 1980) ("It is a rule grounded in necessity and common sense, as well as authority, that the maintenance of discipline in a prison is an executive function with which the judicial branch ordinarily will not interfere." (citation omitted)).

Besides those serious separation of powers concerns, recognizing a *Bivens* remedy would likely cause "an increase of suits by inmates, increased litigation costs to the government, and … burdens on individual prison employees to defend such claims." (Gibbs Reply Br. at 24.) Heeding the reasoning in *Abbasi*, we must be reluctant to "establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation." 137 S. Ct. at 1858. Therefore, we will reverse the District Court's denial of summary judgment with respect to Bistrian's punitive-detention claim. It is not a valid *Bivens* action.[24]

---

[23] Bistrian argues that the Supreme Court has already extended *Bivens* to the prison setting in *Carlson*, and thus, approved of such an encroachment. But medical care issues, which were at issue in *Carlson*, do not require analysis of the reasoning, motivations, or actions of prison officials in the same way a punitive-detention analysis would. 446 U.S. at 15 n.1. Thus, *Carlson* did not encroach on the executive branch in the manner Bistrian seeks.

[24] Since we conclude that the punitive detention claim is not cognizable, we need not address whether any of the defendants are entitled to qualified immunity with respect to that claim.

31

### 3. *Retaliation Under the First Amendment*

Likewise, we conclude that Bistrian's claim for retaliation under the First Amendment presents a new context for *Bivens* and that special factors counsel against allowing such a claim.

In the heyday of *Bivens* expansion, we recognized an implied right to sue federal officials for damages for a violation of the First Amendment. For example, in *Paton v. La Prade*, we held that a high school student could seek a remedy under *Bivens* after the FBI created a dossier on her because she mailed an envelope to the Socialist Workers Party. 524 F.2d 862, 864-66, 870 (3d Cir. 1975). We later extended *Paton* to imply a *Bivens* remedy under the First Amendment for the denial of a prisoner's right of access to courts. *Milhouse v. Carlson*, 652 F.2d 371, 373-74 (3d Cir. 1981). More recently, we implied a *Bivens* remedy for an inmate's claim that prison officials retaliated against him for his exercise of his First Amendment rights. *Mack v. Warden Loretto FCI*, 839 F.3d 286, 297 (3d Cir. 2016) ("[W]e reject the Government's plea to not 'extend' *Bivens* to Mack's First Amendment retaliation claim."). Since those cases were decided, however, the Supreme Court issued its opinion in *Abbasi*, which clearly communicates that expanding *Bivens* beyond those contexts already recognized by the Supreme Court is disfavored. *Abbasi*, 137 S. Ct. at 1857. It is *Abbasi*, not our own prior precedent, that must guide us now.

The Supreme Court has never recognized a *Bivens* remedy under the First Amendment. *See Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012) ("We have never held that

*Bivens* extends to First Amendment claims."). Accordingly, from the vantage of boundaries set by the Supreme Court, Bistrian's First Amendment retaliation claim is novel. We thus turn to the special factors analysis.

Retaliation claims are based on an adverse action following the exercise of constitutional rights. Here, Bistrian alleges that his fourth placement in the SHU was punishment for complaining about his treatment by prison officials. Like a punitive detention claim, retaliation claims like this one are grounded in administrative detention decisions. Whether to place an inmate in more restrictive detention involves real-time and often difficult judgment calls about disciplining inmates, maintaining order, and promoting prison officials' safety and security. *See Sewell v. Pegelow*, 291 F.2d 196, 197 (4th Cir. 1961) (stating that courts should not interfere in prison administration when "particular disciplinary measures were taken within the normal management of the institution."). That strongly counsels restraint, just as in the punitive-detention context. For the same reasons we reject an extension of *Bivens* to that latter context, we reject it here as well. Such claims must be approached "with skepticism and particular care" because they are "easily fabricated and … may cause unwarranted judicial interference with prison administration." *Holmes v. Grant*, No. 03 Civ. 3426 RJH RLE, 2006 WL 851753, at *14 (S.D.N.Y. Mar. 31, 2006) (citation omitted) (discussing First Amendment retaliation claims).

That conclusion aligns with a strong trend in district courts, post-*Abbasi*, holding that a *Bivens* retaliation claim under the First Amendment should not be recognized. *See Akande v. Philips*, No. 1:17-cv-01243 EAW, 2018 WL

33

3425009, at *8 (W.D.N.Y. July 11, 2018) (collecting cases and noting that "[n]ationwide, district courts seem to be in agreement that, post-*Abbasi*, prisoners have no right to bring a *Bivens* action for violation of the First Amendment" (citation omitted)).  We agree with that view.

Bistrian's retaliation claim involves executive policies, implicates separation-of-power concerns, and threatens a large burden to both the judiciary and prison officials. We thus conclude that the special factors analysis prevents an extension of *Bivens* to cover such claims.  Accordingly, we will reverse the District Court's denial of summary judgment with respect to his retaliation claim.[25]

## V.    CONCLUSION

For the foregoing reasons, we will affirm the District Court's denial of summary judgment for the defendants on Bistrian's failure-to-protect claim but will reverse its decision with respect to his punitive detention and retaliation claims.

---

[25] Because we conclude that the retaliation claim is not a recognized *Bivens* remedy, we again need not address whether any of the defendants are entitled to qualified immunity.