**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-3051
_____

JEREMY V. PINSON,
                                        Appellant

v.

UNITED STATES OF AMERICA; FEDERAL BUREAU OF PRISONS;
ELIZABETH SANTOS; M. MAGYAR, Assistant Health Services Administrator

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civ. No. 1-17-cv-00584)
District Judge: Honorable Sylvia H. Rambo
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
September 9, 2020
Before: SHWARTZ, RESTREPO, and GREENBERG, Circuit Judges

(Opinion filed: September 10, 2020)
_____

OPINION[*]
_____

PER CURIAM

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Jeremy V. Pinson, a federal prisoner proceeding pro se, appeals from the District Court's order granting summary judgment in favor of the defendants. For the following reasons, we will vacate the grant of summary judgment and remand for further proceedings.

I.

A.      Pinson's Incarceration and Medical Treatment at FCI-Allenwood

Pinson is a male-to-female transgender inmate who was incarcerated at FCC-Allenwood for approximately four months in 2016. Upon arrival on March 10, 2016, Pinson was screened by the Psychology department. The screening notes indicate that Pinson had been receiving psychological treatment throughout her incarceration and had been diagnosed with gender dysphoria in June 2015. She had begun using a feminizing hormone (Estradiol patch) in late December 2015. The screener also noted that Pinson had a history of suicidal ideation and harming herself. The screener recommended that she be housed with the general prison population but placed her in the Special Housing Unit (SHU) pending a final determination.

Pinson was designated a "care level 3" inmate and attended private sessions with a psychologist at least once per week.[1] Pinson's medical records from her four months at

_____

[1] "Care Level 3 inmates are outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications." Fed. Bur. of Prisons Clinical Practice Guidance, Care Level Classification, May 2019.

USP-Allenwood exceed 500 pages.[2]  Physician and Clinical Director E. Stahl (formerly E. Santos) was generally involved in only the co-management of Pinson's trans-health, but she also met with Pinson individually on at least three occasions.[3]  During a March 17, 2016 meeting with Pinson, Pinson reported that she had begun cutting herself— including her genitalia—when she was incarcerated at the age of seventeen.

On April 14, 2016, Pinson was released into the general prison population in order to participate in the "Challenge Program," a residential program designed to meet the treatment needs of high-security inmates with mental-health or substance-abuse disorders.  On May 2, 2016, Pinson reported that another inmate had threatened to "pimp out" her and her cellmate.  She was returned to the SHU pending an investigation into the allegations under the Prison Rape Elimination Act (PREA).

Approximately two weeks later, on May 13, 2016, Pinson reported suicidal thoughts and was placed on suicide watch.  She was re-evaluated on May 15, 2016 and taken off watch.  On May 18, 2016, Pinson reported that she was feeling a desire to harm

---

[2] The psychologists' notes reflect that Pinson often claimed that she had suicidal thoughts in order to be seen by the psychologist, but once in the session, she would focus on obtaining personal property or hygiene items.  The notes further reflect that Pinson threatened to sue staff or harm herself when she was frustrated about not getting what she wanted.

[3] In addition to overseeing staff as the Clinical Director at the prison, Dr. Stahl also served as the Chair of the Transgender Clinical Care Team (TCCT), which was established in November 2014 to provide guidance to BOP staff treating inmates with transgender concerns.

herself and surrendered a razor to her psychologist. The psychologist concluded that Pinson was not suicidal, but rather was using the threat of self-harm to manipulate psychology staff into meeting with her so that she could obtain missing personal property. On May 19, 2016, the SHU lieutenant advised the psychology office that Pinson was potentially suicidal. Pinson met with a psychologist at that time. She stated that she was upset because the Warden had told her that she was manipulating staff. The psychologist concluded that Pinson was at low risk for suicide and that suicide watch was unnecessary. On May 24, 2016, Pinson asked for an increase in medication and a prescription for Ativan. She denied having any suicidal ideation or urges to harm herself.

On May 25, at 12:30 pm, a lieutenant making rounds in the SHU discovered Pinson cutting her left arm with a razor. Pinson was taken to health services where doctors determined that she had sustained multiple lacerations to her left arm, left leg, front and back of the head, scrotum, and tongue. Pinson was transported to a local hospital for further treatment. She was then placed back on suicide watch.[4]

---

[4] On May 27, 2016, Pinson filed an administrative tort claim asserting that the prison staff negligently gave her a razor, refused to provide her pain medication before and after her hospitalization, and failed to adequately treat her wounds upon return to the prison. Claim for Damage, Injury, or Death, ECF No. 52-1, Ex. A.

On June 5, 2016, Pinson submitted an "Informal Resolution Form"[5] to her correctional counselor asking "if the BOP offers sex reassignment surgery to its inmates, yes or no." Informal Resolution Form, p. 723, ECF No. 31-1. Assistant Health Services Administrator (AHSA) M. Magyar responded to Pinson's inquiry. Magyar explained that the prison follows community standards for treatment of transgender health, including those set forth by the World Professional Association for Transgender Health (WPATH).[6] Magyar stated that, according to the WPATH, criteria for sex-reassignment surgery (SRS) include: (a) well-documented gender dysphoria; (b) capacity to consent to treatment; (c) age of majority; (d) twelve months of feminizing hormone therapy; and (e) twelve months of continuous living in the gender role that is congruent with one's gender. After reviewing Pinson's medical records, Magyar concluded that she did not yet meet the criteria for SRS. Magyar noted that Pinson had been on a feminizing hormone only since January, and that, as a result of her hospitalization and short stay in general population, she had not demonstrated twelve months of living in the gender role

---

[5] Prior to filing a Request for Administrative Remedy Form, prisoners must ordinarily attempt to informally resolve their complaints through their Correctional Counselors. See Informal Resolution Form, p. 723, ECF No. 31-1.

[6] Several months after Pinson's incarceration at FCC-Allenwood, the BOP released clinical guidelines for treating transgender inmates with gender dysphoria, titled "Medical Management of Transgender Inmates."

congruent to her gender. Magyar also noted that Pinson's psychiatric illness was not yet well controlled.

Once the Special Investigative Service had completed its investigation into Pinson's PREA-related allegations, it was determined that she should be transferred to another facility. On July 18, 2016, Pinson was transferred to USP Terre Haute.

B.     Procedural History

In March 2017, Pinson filed a complaint, which she later amended, in the District Court pursuant to Bivens[7] and the Federal Tort Claims Act (FTCA). Pinson claimed that AHSA Magyar and Dr. Stahl had violated her Eighth Amendment rights by denying her request for SRS based on pretext. Pinson also claimed that the United States and the Bureau of Prisons (BOP) were liable under the FTCA for Correctional Officer Frei's failure to collect her razor when the officer was on notice that her gender dysphoria could lead her to self-mutilate. As relief, Pinson requested one million dollars in damages, an injunction requiring the BOP to provide Pinson with SRS, and a declaration that the prison's medical treatment violated her Eighth Amendment rights.

Following discovery, the defendants moved for summary judgment on the grounds that, inter alia: (1) Pinson's request for injunctive relief was moot because she is no

---

[7] "A Bivens action, which is the federal equivalent of the § 1983 cause of action against state actors, will lie where the defendant has violated the plaintiff's rights under color of federal law." Brown v. Philip Morris Inc., 250 F.3d 789, 800 (3d Cir. 2001) (discussing Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971)).

longer incarcerated at FCC-Allenwood; (2) AHSA Magyar could not be liable under the Eighth Amendment because he was not personally involved in Pinson's medical treatment; (3) Dr. Stahl was not deliberately indifferent to Pinson's medical needs, but rather counseled against SRS because Pinson did not meet the clinical criteria; and (4) Pinson failed to establish a prima facie case of negligence under the FTCA/Pennsylvania law because (a) the United States' actions regarding the razor were reasonable in light of its obligation to balance Pinson's safety needs with her medical needs and (b) the United States' actions regarding the razor were not a "substantial factor" in bringing about Pinson's injuries. Pinson submitted a brief in opposition to the defendants' motion, a counterstatement of material facts[8] and a declaration contesting a number of facts in the defendants' motion. The District Court granted the defendants' motion for summary judgment.[9]

Pinson moved for reconsideration, arguing that the District Court had erred by failing to address all the averments in her declaration and by making numerous factual determinations and credibility findings that should have been left to a jury. She also

---

[8] The District Court determined that Pinson's counterstatement of material facts failed to comply with Local Rule 56.1 insofar as it failed to include any record citations or references. As a result, the District Court deemed the facts set forth by the defendants to be undisputed unless otherwise noted. As discussed further below, the District Court ultimately acknowledged some, but not all, of the facts that Pinson included in her declaration attached to her counterstatement of material facts.

[9] The District Court also denied Pinson's pending motion for discovery as moot.

7

argued that the District Court erred by failing to appoint counsel and a medical expert to assist her. The District Court denied the motion for reconsideration.

Pinson timely appealed.

## II.

This Court has jurisdiction under 18 U.S.C.§ 1291. We review the grant of summary judgment de novo, applying the same standard as the District Court. See Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 265 (3d Cir. 2014). Summary judgment is proper if, viewing the record in the light most favorable to Pinson, there is no genuine issue of material fact and the defendants are entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Giles v. Kearney, 571 F.3d 318, 322 (3d Cir. 2009). We review the denial of a motion for reconsideration for an abuse of discretion. Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 673 (3d Cir. 1999).

## III.

A.    Eighth Amendment

In order to establish an Eighth Amendment deliberate indifference claim, a claimant must demonstrate: (1) a serious medical need; and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. Estelle v. Gamble, 429 U.S. 97, 104 (1976). Deliberate indifference has been found "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents

8

a prisoner from receiving needed or recommended medical treatment." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

In her amended complaint, Pinson claimed that AHSA Magyar and Dr. Stahl violated her Eighth Amendment rights by denying her request for SRS. Specifically, Pinson alleged that Magyar and Stahl denied her request in retaliation for her having filed a grievance and for political reasons unrelated to her medical needs.[10]

The defendants moved for summary judgment on Pinson's Eighth Amendment claims on the grounds that: (1) Magyar, a non-medical prison official, could not be liable under the Eighth Amendment because he was not personally involved in Pinson's medical treatment; and (2) the medical records showed that Stahl provided Pinson with adequate medical care by deciding her request for surgery based on community standards. The District Court agreed on both counts.

In granting summary judgment to the defendants, however, the District Court failed to address Pinson's evidence that Magyar and Stahl denied her request for non-medical reasons. Pinson attached to her Counterstatement of Material Facts a declaration

---

[10] Pinson did not include a retaliation claim in her amended complaint, but attempted to add one in her brief in opposition to defendants' summary judgment motion. The District Court declined to consider the claim on the ground that she was not permitted to amend her complaint through an opposition brief. We see no error in this ruling. See Shanahan v. City of Chi., 82 F.3d 776, 781 (7th Cir.1996) (stating that a plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment"). In any event, the Supreme Court has not recognized a Bivens remedy under the First Amendment in the prison context. See Bistrian v. Levi, 912 F.3d 79, 96 (3d Cir. 2018).

averring (under penalty of perjury) that she had a discussion with Magyar and Dr. Stahl in June 2016 in which "they specifically said [she] was being denied sex reassignment surgery because [she] had requested it in a request for administrative remedy and also stated if [she] continued to file on staff [she] would just be transferred and receive no treatment." Decl. ¶ 21, ECF No. 47-1. Pinson also alleged that "[b]oth Magyar and Stahl stated the BOP would never provide sex reassignment surgery but that 'for political reasons we will consider it as a policy but never actually follow through' because 'FOX News and Republicans would go crazy.'" Id. ¶ 23.

We conclude that Pinson's averments were sufficient to withstand the defendants' summary judgment motion. While Pinson did not provide any additional evidence in support of her declaration, an affidavit is "about the best that can be expected from [a pro se prisoner] at the summary judgment phase of the proceedings." See Brooks v. Kyler, 204 F.3d 102, 108 n.7 (3d Cir. 2000) (quotation marks and alterations omitted). If, as Pinson alleged, Magyar and Stahl denied her surgery for these reasons, a jury could conclude that they violated her Eighth Amendment rights. See Durmer v. O'Carroll, 991 F.2d 64, 67-69 (3d Cir. 1993) (reversing in part district court's judgment on the ground that genuine issue of material fact existed as to whether physician-in-charge knew that prisoner should receive physical therapy and deliberately failed to provide it for non-medical reasons). And, while prison administrators like Magyar generally cannot be charged with deliberate indifference to a prisoner's medical needs due to their lack of

10

personal involvement in the medical decisions, see Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004), in this case Pinson averred that Magyar himself told Pinson that he denied the request for non-medical reasons. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).

B.    FTCA Claim

The FTCA "provides a mechanism for bringing a state law tort action against the federal government in federal court." In re Orthopedic Bone Screw Prod. Liab. Litig., 264 F.3d 344, 362 (3d Cir. 2001). The "extent of the United States' liability under the FTCA is generally determined by reference to state law." Id. (quotation marks omitted). In this case, because the allegedly tortious conduct occurred in Pennsylvania, the Court refers to Pennsylvania tort law to assess Pinson's negligence claim. Under Pennsylvania law, in order to establish a cause of action for negligence, the plaintiff must prove the following elements: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages." Nw. Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 139 (3d Cir. 2005).

Pinson claimed that one of the correctional officers at the prison, Officer Frei, was negligent for leaving a razor with her while aware that her gender dysphoria might lead her to harm herself. In their motion for summary judgment, the defendants argued that Pinson failed to establish a negligence claim because extensive efforts were used to monitor Pinson's psychological state and Pinson was not on razor restrictions or suicide

11

watch on May 25, 2016. The defendants noted that during the days leading up to the incident, Pinson was not on any razor restrictions because there was no clinical indication of a risk of self-harm or suicide. The defendants argued that Officer Frei could not have left a razor with Pinson before the incident because he did not work on May 24 and did not arrive at the prison until after the incident on May 25.[11] Officer Frei stated in his affidavit that Pinson never told him that she wanted to cut out her testicles, and that he never told her that he did not care if she did.

In her declaration, Pinson averred that she was given a razor every day because Dr. Stahl had instructed staff that she should be permitted to shave daily. She stated that Officer Frei gave her a razor on May 24, 2016, and that she refused to give it back because she was suicidal and felt like hurting herself. According to Pinson, Officer Frei did not try to recover the razor—instead, he told her that "he did not care if [she] hurt herself because he would go home at the end of his shift regardless." Decl. ¶¶ 27-28, ECF No. 47-1. Pinson further averred that she had advised her psychologists that she was suicidal several times before the May 25, 2016 incident—on April 21 and 25, and on May 2, 9, 15, 17, 18, 19, and 24. Id. at ¶¶ 13, 14, 15, 16. For these reasons, Pinson claimed that Officer Frei was negligent for allowing her to keep her razor.

---

[11] The defendants also noted that while Pinson now alleges that she obtained the razor on May 24, 2016, she stated in her administrative tort claim that she obtained it on May 25, 2016.

12

The District Court recognized that the parties disputed the date on which Pinson received the razor and who gave it to her, but concluded that either way, there was no reason for the SHU staff to preclude Pinson from having a razor because she was not on razor restrictions or suicide watch. Therefore, the District Court granted summary judgment in the defendants' favor.

We conclude that the District Court erred by improperly weighing the evidence and discrediting Pinson's declaration. See Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) ("[I]n considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence is to be believed[,] and all justifiable inferences are to be drawn in his favor." (internal quotations omitted)). At the summary judgment stage, Pinson's sworn testimony, standing alone, was sufficient to establish genuine issues of material fact as to whether the United States acted negligently in allowing, or failing to prevent, Pinson from having access to a razor on May 25, 2016.[12] See Paladino

---

[12] The District Court further concluded that to the extent that Pinson claimed that Officer Frei was negligent for failing to collect the razor, such claim was unexhausted because, in her administrative tort claim regarding the incident, she claimed only that a staff member was negligent for providing her with a razor. See 28 U.S.C. § 2675(a) (providing that an action may not be instituted against the United States under the FTCA unless the claimant first presented the claim to the appropriate federal agency and the claim was finally denied by the agency). We think these allegations are sufficiently related to deem the claim exhausted.

v. Newsome, 885 F.3d 203, 209-10 (3d Cir. 2018) (concluding that inmate's sworn deposition testimony, even though self-serving, created a genuine issue of material fact).

### III.

Accordingly, we will vacate the grant of summary judgment and the denial of the motion for reconsideration and remand for further proceedings consistent with this opinion.