**PRECEDENTIAL**

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

_____

No. 18-3504

_____


CHARLES MACK

v.

JOHN YOST, TIM KHUN and JEFFREY
STEPHENS, sued in their individual and
official capacities; and DOUG ROBERTS and
SAMUEL VENSLOSKY, sued in their
individual capacities

Jeffrey Stephens, Samuel Venslosky, and
Douglas Roberts,

                                                  Appellants

_____


On Appeal from the United States District Court
for the Western District of Pennsylvania
(District Court No.: 3-10-cv-00264)
District Judge: Honorable Kim Gibson

_____


Argued April 23, 2020

(Opinion Filed: August 4, 2020)

Before:  PORTER, RENDELL, and FISHER, <u>Circuit Judges</u>

Sarah Czypinski (Argued)
John M. Hagan
K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222

                    Counsel for Appellee
Courtney Dixon (Argued)
Sharon Swingle
Barbara Herwig
Appellate Staff
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Laura S. Irwin
Ira M. Karoll
Office of the United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219

                    Counsel for Appellant

# OPINION

**RENDELL**, Circuit Judge:

Although Congress has never enacted a statute permitting a damages remedy for constitutional claims brought against federal officials, the Supreme Court first recognized an implied damages action for such claims under the Fourth Amendment in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The Supreme Court has since recognized an implied damages remedy in only two other instances.[1] Most recently, in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), the Supreme Court cautioned against creating additional implied damages remedies and explicitly declared *Bivens* expansion a "disfavored judicial activity." *Id*. at 1857 (internal quotations omitted).

Here, Charles Mack, a former inmate, seeks to bring a First Amendment retaliation claim against federal prison officials, alleging that he was terminated from his prison job for complaining that correctional officers were harassing him at work because of his religion. In light of *Abbasi* and our recent precedents, we decline to expand *Bivens* to create a

---

[1] *See Carlson v. Green*, 446 U.S. 14 (1980) (Eighth Amendment claim for failure to render adequate medical care to a federal inmate); *Davis v. Passman*, 442 U.S. 228 (1979) (Fifth Amendment gender discrimination by federal employer).

3

damages remedy for Mack's First Amendment retaliation claim. For the following reasons, we will reverse the District Court's denial of the Government's motion for summary judgment as to this claim.

## I.    BACKGROUND

### A.    Factual Background

Mack is a practicing Muslim and a former inmate at the Federal Correctional Institution in Loretto, Pennsylvania. While an inmate, Mack worked for pay at the prison's commissary from May 26, 2009 until he was terminated on October 21, 2009. During this time, Doug Roberts and Samuel Venslosky were correctional officers at the prison and were assigned to supervise the inmates working in the prison's commissary. Mack alleges that while working in the commissary, he was harassed by Roberts and Venslosky because he is a Muslim. Specifically, Mack alleges that Roberts told him, "I don't like Muslims" and "[t]here is no good Muslim except a dead Muslim." App. 8. Mack also alleges that Roberts placed a sticker on Mack's back which read, "I love pork bacon." *Id.* Mack further alleges that Roberts and Venslosky purposefully attempted to disrupt his prayers, causing Mack to limit his prayers during work.

Mack alleges that he raised these issues with Roberts and Venslosky's supervisor, Jeffrey Stephens, who responded that he would "look into it." *Id.* Mack alleges that upon overhearing Mack's oral complaint to Stephens, Roberts told Mack, "[y]ou are not going to be here long." *Id.* Venslosky fired Mack less than two weeks later.

4

Mack filed an inmate request-to-staff form seeking a written explanation for his termination. The prison informed Mack in writing that he had been fired for bringing another inmate's commissary slip into work. Mack denies ever doing so. Mack then filed a formal administrative remedy request, alleging that he was wrongfully terminated from his work assignment. The Acting Warden informed Mack that his allegation was "referred to the appropriate office for investigation." App. 62. Mack was later informed that his request for an administrative remedy was denied. Mack then filed this federal lawsuit.

## B.    Procedural History

Mack filed a First Amendment retaliation claim against the prison officials,[2] alleging that he was wrongfully terminated for orally complaining to Stephens about Venslosky's and Roberts's religious harassment.[3] The District Court adopted the Magistrate Judge's recommendation to dismiss Mack's complaint for failure to state a claim and dismissed the complaint without leave to amend. Mack appealed the District Court's dismissal, and we reversed and remanded to the District Court, concluding that Mack should have been granted leave to amend. *Mack v. Yost*, 427 F. App'x 70, 72 (3d Cir. 2011) (*Mack I*). Mack filed an amended complaint and the District Court dismissed the amended

---

[2] These officials include: Prison Warden John Yost, Deputy Prison Warden Tim Kuhn, Stephens, Venslosky, and Roberts.

[3] Mack also brings a claim against Roberts and Venslosky under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(a) for their anti-Muslim harassment and hostility. This claim is not at issue in this appeal.

5

complaint for failure to state a claim. *Mack v. Yost*, 979 F. Supp. 2d 639, 652 (W.D. Pa. 2013). Mack again appealed the District Court's dismissal, and we reversed in *Mack v. Warden Loretto FCI*, 839 F.3d 286 (3d Cir. 2016) (*Mack II*).

In *Mack II*, we considered whether Mack presented a cognizable First Amendment retaliation claim under *Bivens*. *Id*. at 296. We first noted that while the Supreme Court never "formally extended" *Bivens* actions to include First Amendment claims, the Court seemed to imply in *Hartman v. Moore*, 547 U.S. 250 (2006), that such actions were available. 839 F.3d at 296. Lacking clear guidance from the Supreme Court, we then turned to our Court's prior precedents. We first referred to our decision in *Paton v. La Prade*, 524 F.2d 862 (3d Cir. 1975), which involved an intrusive FBI investigation of a high school student who had mailed a letter to the Socialist Workers Party as a part of a class assignment. *Id.* at 865-66. We recognized the student's right to proceed with a damages remedy against the FBI agents for denial of First Amendment free speech, noting that the factors which weighed in favor of recognizing a damages action for Fourth Amendment violations in *Bivens* applied equally to First Amendment violations. *Id*. at 869-70. We then cited to our decision in *Milhouse v. Carlson*, 652 F.2d 371 (3d Cir. 1981), which relied upon *La Prade* to recognize a First Amendment retaliation claim brought in the prison context. There, a federal inmate alleged that he was transferred to a less desirable prison cell location in retaliation for initiating a lawsuit against prison officials to remedy his religious grievances. *Id*. at 372-73. We held that the inmate could bring a First Amendment *Bivens* action against the prison officials who sought to punish him for initiating the civil rights action. *Id*. at 374.

6

So, at the time that *Mack II* was decided, we had clearly recognized an implied right to damages to remedy First Amendment violations and had no indication from the Supreme Court that we should exercise restraint in expanding *Bivens* in this context. Relying upon our prior precedents which had "explicitly recognized" a *Bivens* remedy under the First Amendment, we recognized a cause of action for Mack's First Amendment retaliation claim under *Bivens*. *Mack II*, 839 F.3d at 296-97. We also held that the prison officials were not entitled to qualified immunity as to this claim because it was clearly established that inmates have a right to be free from retaliation for exercising their First Amendment rights. *Id.* at 300. Accordingly, we remanded to the District Court and the parties proceeded to discovery. *Id.* at 301.

The Government then moved for summary judgment, arguing that the Supreme Court's decision in *Abbasi*—decided after our decision in *Mack II*—alters our analysis under *Bivens* and forecloses Mack's First Amendment retaliation claim. *Abbasi* involved six men of Arab or South Asian descent, five of whom were Muslim, who had been detained for several months in the wake of the September 11, 2001 terrorist attacks. 137 S. Ct. at 1853. The detainees brought a *Bivens* action against federal officials under the Fourth and Fifth Amendments, challenging high-level executive detention policies and confinement conditions within the detention facility. *Id.*

The Court of Appeals for the Second Circuit determined that the claims did not present a new *Bivens* context. *See id.* at 1852. The Second Circuit relied on its own prior precedents and the Supreme Court's decision in *Carlson v. Green*, 446 U.S. 14 (1980), which recognized a *Bivens* remedy for an

7

Eighth Amendment prisoner mistreatment claim.[4] *Turkmen v. Hasty*, 789 F.3d 218, 235 (2d Cir. 2015), *rev'd in part, vacated in part sub nom. Abbasi*, 137 S. Ct. 1843. Because the claims did not present a "new context," the Second Circuit held that a *Bivens* remedy was available against the federal officials for the detention policy and detainee abuse claims. *Id.* at 236-37. In *Abbasi*, the Supreme Court reversed the Second Circuit's decision regarding the detention policy claim and vacated and remanded the holding regarding the detainee abuse claim. 137 S. Ct. at 1869.

*Abbasi* reflected a "notable change" in the Supreme Court's attitude toward creating an implied damages remedy directly from the Constitution and declared that *Bivens* expansion is now "disfavored." *Id.* at 1857. To curtail improper *Bivens* expansion, *Abbasi* provided a restrictive two-step framework for courts to follow when analyzing *Bivens* claims. First, courts must determine whether the *Bivens* claim presents a "new context." *Id.* at 1859. The Supreme Court defined "new context" broadly, indicating that "a modest extension is still an extension." *Id.* at 1864. *Abbasi* instructed that a context is "new" if it "is different in a meaningful way

---

[4] The plaintiffs also brought a claim under the Free Exercise Clause of the First Amendment, but the Second Circuit determined that the claim presented a "new context" because neither the Supreme Court nor its own prior precedents had previously recognized such a claim. *Turkmen v. Hasty*, 789 F.3d 218, 236 (2d Cir. 2015), *rev'd in part, vacated in part sub nom. Abbasi*, 137 S. Ct. 1843. The Second Circuit declined to extend *Bivens* to include the Free Exercise claim. *Id.*

from previous *Bivens* cases decided by [the Supreme] Court." *Id*. at 1859. The Supreme Court thus rejected the Second Circuit's reliance upon Second Circuit precedent in the "new context" inquiry. As to the Second Circuit's view that the context was not new based on *Carlson*, the Supreme Court acknowledged that the differences between the two cases "are perhaps small" but, given the Court's "expressed caution about extending the *Bivens* remedy," it held that "the new-context inquiry [was] easily satisfied." *Id*. at 1865.

If the case presents a new context, as in *Abbasi*, courts must then determine if there are "special factors counselling hesitation" in expanding *Bivens*. *Id*. at 1857. If "there are any special factors that counsel hesitation," courts must "reject the request" to expand *Bivens*. *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020). The special factors inquiry "concentrate[s] on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id*. at 1857-58. *Abbasi* "urged caution" when expanding *Bivens* actions to new contexts, emphasizing that significant separation-of-powers concerns arise when the Judiciary, rather than Congress, authorizes damages remedies against federal officials. *Id*. at 1857 (internal quotations and citation omitted). When tasked with determining "who should decide" if a damages remedy is available, *Abbasi* warned that "[t]he answer most often will be Congress." *Id*.

Conducting a special factors inquiry of the executive detention policy claim at issue in *Abbasi*, the Supreme Court noted that there was a proper balance between deterring constitutional violations and allowing executive officials to freely make policy decisions related to national security. *Id*. at 1863. The Supreme Court determined that Congress was better

9

positioned to strike such a balance and, based upon its special factors inquiry, refused to extend a *Bivens* remedy for the detention policy claim. *Id*. For the detainee abuse claim, the Supreme Court declined to conduct a special factors inquiry, concluding that the "better course" was to vacate and permit the lower courts to conduct the inquiry on remand. *Id*. at 1865.

The District Court here addressed *Abbasi*'s analytical framework, but seemed concerned with whether it could depart from our decision in *Mack II*, which specifically recognized Mack's *Bivens* claim. Faced with the conflict between our prior precedent and *Abbasi*'s new, demanding standard, the District Court determined that it was "constrained to follow" our decision in *Mack II*. App. 16. Guided by *Mack II*, the District Court held that Mack's claim did not present a "new" *Bivens* context and, therefore, it need not analyze whether special factors counseled hesitation in extending *Bivens*. [5] Accordingly, the District Court concluded that Mack presented a cognizable First Amendment retaliation claim under *Bivens*. The District Court also rejected the prison officials' argument that they were entitled to qualified immunity, and thus denied the Government's motion for summary judgment. The Government now seeks review of the District Court's denial of summary judgment as to Mack's First Amendment retaliation claim.

## II.    JURISDICTION

---

[5] However, the District Court noted that "even if Mack's claims presented a new context, it finds Mack's arguments regarding the lack of alternative remedies and the lack of special factors counseling hesitation to be persuasive." App. 16 n.14 (internal quotation marks omitted).

10

Under the collateral order doctrine, we have jurisdiction to review a district court's denial of summary judgment where the defendants asserted a defense under qualified immunity "to the extent that it turns on an issue of law[.]"  *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).  "Whether a *Bivens* claim exists in a particular context" presents a "threshold question of law that is directly implicated by the defense of qualified immunity."  *Bistrian v. Levi*, 912 F.3d 79, 88 (3d Cir. 2018) (*Bistrian II*) (internal quotation marks and citation omitted); *see also Vanderklok v. United States*, 868 F.3d 189, 197 (3d Cir. 2017) (exercising jurisdiction over denial of summary judgment on qualified immunity grounds to determine whether a *Bivens* action exists).  Therefore, we possess jurisdiction to review on interlocutory appeal whether a damages remedy under *Bivens* exists.

## III.   DISCUSSION

We begin with an overview of the evolution of the *Bivens* doctrine.  *Bivens* involved a Fourth Amendment claim against federal narcotics agents who conducted a warrantless search of a man's home, and allegedly arrested the man without probable cause and threatened to arrest his entire family.  403 U.S. at 389.  In its seminal decision, the Supreme Court held that a damages remedy could be directly implied from the Fourth Amendment to redress the harm that resulted from the federal agents' unconstitutional search and seizure.  *Id*. at 397.

*Bivens* opened the door for courts to exercise their judicial power to fashion a damages remedy against federal officers for other types of constitutional violations.  During the height of *Bivens* expansion, the Supreme Court recognized an implied damages remedy in two other contexts.  First, under the Due Process Clause of the Fifth Amendment for gender

11

discrimination by a federal employer, *Davis v. Passman*, 442 U.S. 228 (1979), and then, one year later, under the Cruel and Unusual Punishments Clause of the Eighth Amendment for failure to render adequate medical care to a federal inmate, *Carlson v. Green*, 446 U.S. 14 (1980). After that, *Bivens* expansion came to a halt. And for the past forty years, the Supreme Court has consistently refused to expand *Bivens* actions beyond these three specific contexts.[6]

---

[6] *See Bush v. Lucas*, 462 U.S. 367 (1983) (rejecting First Amendment claim brought against a federal employer); *Chappell v. Wallace*, 462 U.S. 296 (1983) (rejecting racial discrimination claim brought against military officer); *United States v. Stanley*, 483 U.S. 669 (1987) (rejecting substantive due process claim against military officer); *Schweiker v. Chilicky*, 487 U.S. 412 (1988) (rejecting procedural due process claim against Social Security officer); *FDIC v. Meyer*, 510 U.S. 471 (1994) (rejecting procedural due process claim for wrongful termination against federal agency); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) (rejecting Eighth Amendment claim against private prison operator); *Wilkie v. Robbins*, 551 U.S. 537 (2007) (rejecting due process claim against Bureau of Land Management officials); *Minneci v. Pollard*, 565 U.S. 118 (2012) (rejecting Eighth Amendment claim against private prison employees); *Abbasi*, 137 S. Ct. 1843 (rejecting Fifth Amendment claim against high-level executive officials in national security context); *Hernandez v. Mesa*, 140 S. Ct. 735 (2020) (rejecting Fourth and Fifth Amendment claims against a United States Border Patrol agent).

We have, however, expanded *Bivens* remedies beyond these contexts. As discussed above, we had previously recognized the availability of a damages remedy for First Amendment deprivations by federal officials. *See La Prade*, 524 F.2d 862; *Milhouse*, 652 F.2d 371. Indeed, we relied upon these prior precedents in *Mack II*, noting that they "ma[de] clear" that a *Bivens* action was available for Mack's First Amendment retaliation claim. 839 F.3d at 297. But since the Supreme Court's decision in *Abbasi*, our prior decisions permitting a *Bivens* action for First Amendment claims are clearly called into question and are no longer controlling. *See In re City of Philadelphia Litig.*, 158 F.3d 711, 718 (3d Cir. 1998) (explaining that the law of the case doctrine does not bar a subsequent panel from reconsidering a claim when "supervening new law has been announced"). As we noted in *Bistrian II*, *Abbasi* made clear that lower courts could no longer rely on their own prior precedents to recognize a *Bivens* remedy. *See* 912 F.3d at 95 ("It is *Abbasi*, not our own prior precedent, that must guide us now.").[7] Unless the Supreme

---

[7] In the *Bistrian* cases, we reviewed the viability of a federal inmate's First Amendment retaliation claim against prison officers twice: first, pre-*Abbasi* in 2012, *Bistrian v. Levi*, 696 F.3d 352 (3d Cir. 2012) (*Bistrian I*), and then again, post-*Abbasi* in 2018 (*Bistrian II*). In *Bistrian I*, we relied upon our prior precedents to recognize a *Bivens* remedy for the inmate's First Amendment retaliation claim. *Id.* at 376 n.9. But we changed course in *Bistrian II*, declaring that those prior precedents were no longer controlling after *Abbasi*. 912 F.3d at 95. Conducting a new *Bivens* analysis under the framework set forth in *Abbasi*, we concluded that a *Bivens* remedy was no

13

Court has recognized the context before, the context is "new" and a special factors inquiry is required to determine if *Bivens* expansion is appropriate.

Since deciding *Mack II* and guided by *Abbasi*, we have declined to recognize an implied damages remedy for First Amendment retaliation claims in different contexts. Most recently, in *Bistrian II*, we emphasized that *Abbasi* changed the landscape for how we approach *Bivens* claims. There, a federal inmate brought a First Amendment retaliation claim against prison officials, alleging that he was wrongfully placed in a special housing unit in retaliation for complaining about his treatment by correctional officers. *Id*. at 96. Applying *Abbasi*'s two-step framework, we held that the case presented a new *Bivens* context and that special factors counseled against *Bivens* expansion. *Id*. Thus, we concluded that the inmate did not have a right to bring a *Bivens* action based on the detention decision made by the prison, which he contended was retaliatory. *Id*.

Although we held that a *Bivens* action was foreclosed for the inmate's First Amendment retaliation claim in *Bistrian II*, we must nevertheless conduct a separate inqury to determine if *Bivens* expansion is appropriate here. This is because the special factors inquiry is context-specific, and the factors which counseled hesitation in the prison housing context in *Bistrian II* might be analyzed differently and lead to a different outcome when applied to the prison work assignment context in this case. We must therefore revisit our decision to expand *Bivens* in *Mack II*, which relied upon pre-

---

longer available for the inmate's First Amendment retaliation claim. *Id*. at 96.

14

*Abbasi* Third Circuit precedent. We will apply *Abbasi*'s two-step test to determine whether Mack's First Amendment retaliation claim presents a new context and, if so, whether special factors counsel hesitation in expanding *Bivens*.

### A. New *Bivens* Context

*Abbasi* held that the "proper test" for determining whether a case presents a new *Bivens* context is if the Supreme Court has not previously recognized a claim in that context. 137 S. Ct. at 1859. A context is "new" if it implicates a constitutional right not previously recognized by the Supreme Court. *Id.* at 1860. As noted above, and as we recognized in *Bistrian II*, the Supreme Court has never recognized a *Bivens* remedy for First Amendment retaliation claims brought in the prison context. *See also Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims."). Accordingly, this case presents a new *Bivens* context and a special factors inquiry is required.

### B. Special Factors

Under this inquiry, we must determine whether there are "special factors counselling hesitation in the absence of affirmative action by Congress." *Abbasi*, 137 S. Ct. at 1857 (citation omitted). "[I]f there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy," courts must refrain from expanding *Bivens*. *Id.* at 1858. Two special factors are "particularly weighty": the availability of an alternative remedial structure and separation-of-powers concerns. *Bistrian II*, 912 F.3d at 90 (citing *Abbasi*, 137 S. Ct. at 1857-58). We will first address these two weighty factors and then address the remaining special factors discussed in *Abbasi* and *Bistrian II*.

### i. Alternative Remedial Structure

The Supreme Court has noted that "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Abbasi*, 137 S. Ct. at 1863. Thus, the availability of an alternative remedial structure may, on its own, prevent courts from expanding *Bivens*. The Supreme Court has emphasized that the alternative remedy need not provide an individual with *complete* relief in order to foreclose a damages remedy under *Bivens*. *See Schweiker v. Chilicky*, 487 U.S. 412, 424-25 (1988) (finding the administrative remedy adequate even though it failed to provide any money damages for the federal officials' unconstitutional conduct). The relevant question "is not what remedy the court should provide for a wrong that would otherwise go unredressed," but instead, "whether an elaborate remedial system . . . should be augmented by the creation of a new judicial remedy." *Bush v. Lucas*, 462 U.S. 367, 388 (1983).

As a federal inmate, Mack had access to the BOP's administrative remedy program.[8] In *Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001), the Supreme Court provided an overview of the remedies available to federal inmates through this program. The Supreme Court noted that federal inmates have "full access to remedial mechanisms established by the BOP," *id*. at 74, through which they "may seek formal review of an issue which relates to any aspect of their confinement," *id*. (quoting 28 CFR § 542.10 (2001)).

---

[8] The fact that Mack was unsuccessful in obtaining relief through this program "does not mean that he did not have access to alternative or meaningful remedies." *Vega v. United States*, 881 F.3d 1146, 1155 (9th Cir. 2018) (citation omitted).

Through this process, inmates can alert the BOP to unconstitutional officer conduct and policies and prevent such constitutional violations from recurring. *Id*. In addition to the remedies available through the BOP, federal inmates may also bring an action in federal court to obtain injunctive relief. *Id*.

Here, Mack could have sought equitable remedies through the BOP, including reinstatement to his job in the commissary, and could seek injunctive relief in federal court. This would partially address one of the interests asserted in this case, namely, Mack's loss of employment. Although the alternative remedy would not provide Mack with money damages for the constitutional violation incurred or back pay for his lost wages during the pendency of his claim, *see Nyhuis v. Reno*, 204 F.3d 65, 70 (3d Cir. 2000), this was not a case of "damages or nothing" for Mack, *Abbasi*, 137 S. Ct. at 1862 (citation omitted). Notably, Mack did not sustain any physical injuries with resulting monetary loss, which may have otherwise caused us to create a damages remedy despite the availability of the BOP's administrative remedy.[9]

---

[9] In *Bistrian II*, we held that a *Bivens* remedy was available for the inmate's Fifth Amendment failure-to-protect claim, where he suffered physical injuries from the beating which took place in the prison yard. 912 F.3d at 92. Although the BOP's administrative remedy was also available to the inmate in *Bistrian II*, we nevertheless determined that it was inadequate to redress his physical injuries, "which due to their very nature are difficult to address except by way of damages actions after the fact." *Id*. (citation omitted). Similarly, the Supreme Court recognized the need to redress a failure to render adequate medical care to an inmate by providing a damages remedy in *Carlson*, 446 U.S. at 19.

17

Accordingly, because Mack had access to at least "some redress," *Malesko*, 534 U.S. at 69, through injunctive relief and reinstatement to his prison job, we find that the BOP's administrative remedy program offers a "convincing reason," *Abbasi*, 137 S. Ct. at 1858, for us to refrain from creating a new damages remedy against federal prison officials.

### ii. *Separation of Powers*

In addition to the availability of an adequate alternative remedial structure, we must also consider whether *Bivens* expansion would improperly encroach upon other branches of government. Over the years, the Supreme Court has made explicit that there are certain areas within the executive's domain which are particularly sensitive to judicial intrusion. These include matters related to national security and the military.[10] Where a *Bivens* claim is inextricably intertwined with these executive functions—which often involve a host of considerations related to public safety and security—a *Bivens* remedy will rarely be appropriate. This does not mean that *Bivens* actions may *never* be recognized in these sensitive areas, but rather, courts must be mindful of any unintended consequences that may follow upon creation of a new damages remedy. Because courts are not in a position to second-guess the administrative policies and functions historically within the executive's domain, we must exercise restraint if judicial intervention would ultimately interfere with executive functions. *See Abbasi*, 137 S. Ct. at 1860.

---

[10] *See, e.g.*, *Abbasi*, 137 S.Ct. at 1860 (rejecting *Bivens* claim in national security context); *Stanley*, 483 U.S. at 684 (rejecting *Bivens* claim in military context).

In *Vanderklok*, we considered the viability of a *Bivens* remedy in the context of airport security. 868 F.3d at 199. There, Transportation Security Administration (TSA) personnel stopped a passenger who had a heart monitor and a PVC pipe in his luggage and directed him to a secondary screening area. *Id*. at 194. Believing that the TSA agent was disrespectful and aggressive, the passenger informed the TSA agent that he would file an administrative complaint to report his behavior. *Id*. The passenger alleged that, in response, the TSA agent falsely reported to the Philadelphia police that he had made a bomb threat. *Id*. at 194-95. The passenger then filed a First Amendment claim against the TSA agent, alleging that the agent retaliated against him for threatening to file an administrative grievance. *Id.* at 193.

In our analysis, we first noted that the TSA was specifically created in response to the September 11, 2001 terrorist attacks to secure airports throughout the nation from future attacks. *Id*. at 206. We determined that allowing private individuals to bring a damages action against TSA officials could cause officials to hesitate before making critical, split-second decisions which directly affect national security. *Id*. at 207. Because national security policy "is the prerogative of the Congress and President" we were particularly mindful of any future, and potentially devastating, consequences which could arise from judicial intervention in this sphere. *Id*. (quoting *Abbasi*, 137 S. Ct. at 1861). Balancing the need for passenger rights with the significant dangers associated with airport security, we concluded that Congress was better positioned to create a damages remedy in this area, and thus declined to extend a *Bivens* remedy for the First Amendment retaliation claim in *Vanderklok*. *Id*. at 209.

We performed a similar analysis in *Bistrian II*, which involved a First Amendment retaliation claim brought in the prison housing context. We noted that the inmate's claim that he was unlawfully placed in a restrictive housing unit was "grounded in administrative detention decisions[,]" which involve "real-time and often difficult judgment calls about disciplining inmates, maintaining order, and promoting prison officials' safety and security." 912 F.3d at 96. We therefore determined that creating a damages remedy in that context would improperly interfere with administrative detention decisions, which lie squarely within the executive's domain. *Id*. at 94-95.

Expanding *Bivens* in the context presented here would similarly invite intrusive judicial inquiry into the BOP's administrative decisions. Although we recognize that hiring and firing decisions for inmate work assignments are not as weighty as the decisions in *Bistrian II* related to where and how an inmate is detained,[11] we nonetheless find that the same considerations support leaving such determinations to the executive branch. First Amendment retaliation claims often require an "analysis of the reasoning, motivations, or actions of prison officials," which counsels against *Bivens* expansion. *Id*. at 95 n.23. Mack alleges that he was terminated from his prison job for complaining that he was being harassed because of his religious beliefs. BOP officials contend that he was

---

[11] Unlike prison employment, detention policies directly implicate a main BOP function—to provide a secure and controlled environment for inmates while they serve their sentences of imprisonment—and therefore could be said to demand a higher level of judicial deference than prison work assignment policies.

20

terminated for bringing in other inmates' commissary slips in violation of BOP rules. In order to succeed on this claim, Mack would need to establish a causal connection between his oral complaint and his termination, which requires analysis of the officers' reasons and motivations for his termination.[12] We should hesitate before embarking down such a path. Further, as was the case in *Bistrian II*, the BOP, not the judiciary, is responsible for delegating prison work assignments and overseeing the operational needs of the prison. *See* 28 CFR § 545.23 (detailing the guidelines and policies for prison work assignments). Courts have recognized that such day-to-day administrative decisions have been committed solely to the province of the BOP. *See Turner v. Safley*, 482 U.S. 78, 85 (1987) ("Prison administration is . . . a task that has been committed to the responsibility of [the legislative and executive] branches, and separation of powers concerns counsel a policy of judicial restraint."). Thus, we have afforded a level of deference to the decision making of prison officials. *See, e.g.*, *Florence v. Bd. of Chosen Freeholders*, 621 F.3d 296, 302 (3d Cir. 2010), *aff'd*, 566 U.S. 318 (2012) ("[P]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve

---

[12] "A prisoner alleging retaliation must show (1) constitutionally protected conduct, (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him." *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (alterations, citations, and internal quotation marks omitted).

21

internal order and discipline and to maintain institutional security." (citation omitted)).

We therefore find that, on balance, judicial intervention in such administrative decisions would improperly encroach upon the executive's domain. Heeding *Abbasi*'s cautionary language regarding the appropriate exercise of judicial power, we conclude that these separation-of-powers concerns counsel against *Bivens* expansion in this context.

### *iii. Other Special Factors*

We must also consider whether Congressional silence in a particular subject area suggests that Congress did not want to create a damages remedy in that context. *See Abbasi*, 137 S. Ct. at 1865. Where Congress specifically had occasion to consider whether to grant a damages remedy against federal officials and failed to do so, the Supreme Court has held that such silence may be "more than inadvertent." *Id*. at 1862 (internal quotation marks omitted). This is a delicate balance and we must be careful not to derive meaning from Congressional inaction where none was intended. The Government makes two arguments under this factor, but we find neither to be persuasive.

First, the Government argues the Prison Litigation Reform Act ("PLRA") suggests that Congress had specific occasion to create a damages remedy for constitutional violations against federal officials and chose not to do so. We considered this exact argument in *Bistrian II* and noted that because the PLRA "govern[s] the process by which federal prisoners bring *Bivens* claims[,]" it "cannot rightly be seen as dictating that a *Bivens* cause of action should not exist at all." 912 F.3d at 93 (citations omitted). We again reject the

argument that Congressional silence within the PLRA suggests that Congress did not want a damages remedy against prison officials for constitutional violations. This argument is untenable, as it would arguably foreclose all *Bivens* claims brought in the prison context, which would run counter to the Supreme Court's ruling in *Carlson* and our recent ruling in *Bistrian II* regarding the inmate's Fifth Amendment duty-to-protect claim. *See supra* n.10.

The Government attempts to bolster this argument by noting that the PLRA bars recovery of emotional and mental damages without a corresponding physical injury, and by extension, asking us to infer that Congress did not intend to create a damages remedy for First Amendment retaliation claims, which rarely involve physical injuries. *See* 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act."). But mental or emotional injuries cannot be equated with constitutional violations and we therefore find this point unpersuasive.

Second, the Government argues that Congress's failure to include inmates in worker protection laws—for example, the Fair Labor Standards Act or Title VII of the Civil Rights Act—suggests that Congress did not want to extend a *Bivens* remedy in the prison work assignment context. However, the relationship between inmate and prison is not the same as a traditional relationship between employee and employer. *See Tourscher v. McCullough*, 184 F.3d 236, 243 (3d Cir. 1999). The BOP's primary function is one of confinement and public safety and, though it does employ inmates, such employment is subject to numerous safety-related restrictions that are not otherwise present in a traditional employment relationship.

Given these differences, we find that the Government asks us to read too much into Congressional silence as it relates to worker protection laws. Accordingly, we decline to ascribe any meaning to Congress's failure to mention federal inmates in these statutes and conclude that legislative inaction does not counsel hesitation in this context.

For the final special factor, *Abbasi* counsels us to consider the burdens and costs associated with "establish[ing] whole categories of cases in which federal officers must defend against personal liability claims." 137 S. Ct. 1858. This factor is inherently forward-looking and asks us to consider the practical effects of *Bivens* expansion. Some considerations include burdens to the judiciary, litigation costs for federal officers, and potential impacts that the threat of liability may have on an officer's ability to serve the public. Some of these considerations are undoubtedly present whenever a court considers creating a damages remedy against federal officers, yet there are certain circumstances where the benefits of *Bivens* expansion will outweigh these burdens. We must therefore take a hard look at how the relevant players will be affected and ask if this is really a situation in which courts should be creating a new damages remedy. In certain situations, the impact may be minimal and a remedy warranted, but there is no need for us to say here what those situations might be, for this case is not one of them.

First Amendment retaliation claims brought by inmates should be approached "with skepticism and particular care" because such claims are easy to allege and difficult to prove. *Bistrian*, 912 F.3d at 96 (citation omitted). This is particularly true where, as is the case here, there is no formal record of the oral grievance. Because these types of claims are "easily fabricated" and cannot be readily dismissed on the pleadings,

24

we are hesitant to create a category of cases which may well open the floodgates to litigation in this sphere. *Id.* (citation omitted). Such lawsuits could ultimately clog the courts and burden individual prison officials with the costs and resources needed to defend such suits. Equally important to these financial considerations, the fear of such suits and the efforts needed to defend against them may detract from an officer's ability to properly fulfill his duties to the federal government. This is especially troubling in the prison context, an area in which we want officials to be able to do their job without concern that their actions will result in considerable cost and worry. While there are certainly circumstances where we should hold prison officers accountable by imposing a damages remedy, here, the above concerns weigh against doing so.

Based on the above special factors inquiry, we find that *Bivens* expansion would be an inappropriate exercise of judicial power in this new context. There may be future cases where we determine that, on balance, judicial intervention is needed to fulfill our obligation to faithfully uphold the Constitution. But in this case, we will exercise restraint and allow Congress to decide whether to redress the harm present in these types of cases. Accordingly, we decline to extend a *Bivens* remedy for First Amendment retaliation claims brought in the prison workplace assignment context.[13]

## IV. CONCLUSION

---

[13] Because a *Bivens* cause of action is not available for Mack's First Amendment retaliation claim, we need not analyze whether the officials are entitled to qualified immunity as to this claim.

25

For the foregoing reasons, we will reverse the District Court's denial of summary judgment as to Mack's First Amendment retaliation claim and remand for further proceedings.