**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2603
_____

WALTER ANDERSON,
                              Appellant

v.

MICHAEL DOHMAN; KATHY BRITTAIN
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 3-18-cv-01741)
District Judge: Honorable Jennifer P. Wilson
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
June 11, 2024
_____

Before: KRAUSE, MATEY, and CHUNG, <u>Circuit Judges</u>

(Opinion filed: August 5, 2024)

_____

OPINION[*]
_____

PER CURIAM

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Walter Anderson appeals pro se from orders of the District Court dismissing his claims pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review of the District Court's orders. Allah v. Seiverling, 229 F.3d 220, 223 (3d Cir. 2000). For the reasons set forth below, we will affirm.

I.

We write primarily for the parties, so we will recite only the facts necessary for our discussion. In August 2018, Anderson, a state inmate presently incarcerated at SCI–Frackville, filed a pro se civil rights complaint pursuant to 42 U.S.C. § 1983 in the Eastern District. He alleged that the named defendants employed at SCIs Frackville and Graterford violated his constitutional rights by engaging in an extended conspiracy, beginning in 2010, to pressure him into providing names of "dirty" correctional officers to Major Michael Dohman and then to retaliate against him for his refusal to do so.

This alleged retaliation took the form of repeated denials of visitation rights to one of Anderson's friends, denial of single cell status resulting in psychological distress, tampering with his legal documents, and, ultimately, a transfer to Frackville in 2018. In September 2018, the Eastern District of Pennsylvania dismissed all claims against the Graterford defendants based on the statute of limitations, Anderson's lack of standing, and his failure to state a claim. Because all of Anderson's remaining claims arose from events which occurred at SCI–Frackville, located in the Middle District of Pennsylvania, the Court ordered the remaining claims transferred there.

Anderson then filed his first amended complaint. The Middle District screened Anderson's complaint and dismissed most claims, but permitted him to amend. Anderson did so, alleging that defendants Dohman and Brittain had violated his constitutional rights by attempting to use harassment and denial of privileges to compel him to provide names of "dirty" correctional officers, putting him at risk of being labeled an informant. The second amended complaint also alleged that defendant Brittain had improperly denied Anderson visiting privileges and a single cell. Anderson claims that these actions were both retaliatory and amounted to a denial of his First, Fourth, Eighth, and Fourteenth Amendment rights. The Defendants moved for summary judgment.

In August 2023, the District Court dismissed Anderson's second amended complaint pursuant to 28 U.S.C. 1915(e)(2)(B)(ii) and denied any outstanding motions as moot. The Court reasoned that Anderson had failed to state a retaliation claim because "[r]efusing to become a prison informant is not a constitutionally protected activity," and because Anderson had not pled sufficient facts to infer that the alleged adverse actions were sufficiently related to Anderson's refusal to provide information to Dohman. Finally, Anderson's Constitutional claims stemming from the denial of his friend's visitation rights, his transfer to SCI–Frackville, and the denial of his request for single cell status failed to state a claim for denial of a constitutional right. This appeal followed.

II.

We will affirm the District Court's judgment. We note that, while Anderson raised a variety of claims in the District Court, on appeal, he challenges only the District Court's conclusion that he lacked a constitutional right to refuse to become a prison informant,

3

and we will limit our discussion accordingly.[1] See M.S. by & through Hall v. Susquehanna Twp. Sch. Dist., 969 F.3d 120, 124 n.2 (3d Cir. 2020).

As to that claim, we agree with the appellees that they are protected by qualified immunity. Qualified immunity "shields governmental officials from suit and from liability if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Mack v. Yost, 63 F.4th 211, 221 (3d Cir. 2023) (citation omitted). The analysis of a qualified immunity claim is guided by a two-part test: (1) "whether the facts . . . show the violation of a legal right," and (2) "whether that right was clearly established." Id. at 227. A court may address these steps in either order. See Pearson v. Callahan, 555 U.S. 223, 236 (2009); see also Reichle v. Howards, 566 U.S. 658, 664 (2012) (stating that "courts may grant qualified immunity

---

[1] Anderson does object to the Eastern District's ruling that many of his claims were time-barred and its decision, after dismissing all claims concerning defendants who resided within its district, to transfer the remaining claims to the Middle District. Our determination that the defendants are entitled to qualified immunity makes it unnecessary to address the timeliness issue, but we do observe that, contrary to Anderson's argument, the continuing-violations doctrine does not apply because each alleged act of retaliation gave rise to a discrete cause of action. See Wisniewski v. Fisher, 857 F.3d 152, 158 (3d Cir. 2017); see generally Randall v. City of Phila. Law Dep't, 919 F.3d 196, 198–99 (3d Cir. 2019). Further, after dismissing the claims against the defendants who resided within the Eastern District, it was a permissible exercise of the District Court's discretion to transfer the remaining claims to the Middle District. See generally Cottman Transmission Sys., Inc. v. Martino, 36 F.3d 291, 296 (3d Cir. 1994).

Although the District Court did not explicitly conduct a qualified immunity analysis, implicit in its discussion that "[r]efusing to become a prison informant is not a constitutionally protected activity" was the conclusion that defendants did not violate clearly established law. Ord. Dismissing Second Amended Complaint, ECF No. 56, at 8. Upon assessing Defendants' conduct under the standards of qualified immunity, we reach the same conclusion.

4

on the ground that the purported right was not 'clearly established' . . . without resolving . . . whether the purported right exists at all").

For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). In determining if a right is clearly established, we look to "binding Supreme Court and Third Circuit precedent or [to] a robust consensus of cases of persuasive authority in the Courts of Appeals." James v. N.J. State Police, 957 F.3d 165, 170 (3d Cir. 2020) (quotation marks omitted). A case need not be "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011); see also District of Columbia v. Wesby, 583 U.S. 48, 63 (2018) ("The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."). The constitutional right must be clearly established at the time of the alleged misconduct. Pearson, 555 U.S. at 244 (citing Wilson v. Layne, 526 U.S. 603, 614 (1999)).

At the time of the alleged conduct (primarily alleged to have occurred between 2010 and 2015, with the final alleged conduct occurring in April 2018), neither the Supreme Court nor any federal appellate court had held that a prisoner possesses a constitutional right to refuse to provide information to an internal prison investigation. See Burns v. Martuscello, 890 F.3d 77, 94 (2d Cir. 2018) (making that point). The District Court decisions were inconsistent, with some concluding that there is no such right, see, e.g., Woolfolk v. Meier, Civ. No. 2:17-CV-03513, 2018 WL 1773397, at *4

(E.D. Pa. Apr. 12, 2018); Jackson v. Dohman, Civ No. 11-6890, 2013 WL 775598, at *3 (E.D. Pa. Mar. 1, 2013), and some ruling that there is such a right (at least in certain circumstances), see, e.g., Cooper v. Beard, Civ. No. 06-0171, 2006 WL 3208783, at *12 (E.D. Pa. Nov. 2, 2006); cf. United States v. Paguio, 114 F.3d 928, 930 (9th Cir. 1997).

These scattered District Court opinions are insufficient to clearly establish a right. James, 957 F.3d at 170-73; see also Burns, 890 F.3d at 94-95. While the Second Circuit has since concluded that there is a First Amendment right to refuse to serve as an informant, Burns was issued after the events at bar had taken place and thus does not show that Anderson's rights were clearly established at the relevant time. See Pearson, 555 U.S. at 243-44.

Accordingly, we will affirm the District Court's judgment.

KRAUSE, *Circuit Judge*, concurring.

I agree with my esteemed colleagues in the majority that, regardless of whether an inmate has a "right to refuse to provide information to an internal prison investigation," Majority Op. 5, that right was not "clearly established" at the relevant time, so we may affirm on the second prong of the qualified immunity test without reaching the first prong (i.e., the existence of the constitutional right). *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009). At the same time, however, the Supreme Court has authorized us to address the two prongs in any order, *id.* at 236, for good reason. Perpetually failing to recognize a right can prevent it from *ever* becoming clearly established, *see id.*, and where a district court has erroneously denied the existence of a constitutional right, there is all the more reason to address the existence prong first and set the law straight.

Such is the case here. Thus, while I join the majority opinion as far as it goes, I write separately to address the existence of the right and to encourage our Court, as the Second Circuit has done, to engage both prongs of the qualified immunity test and to acknowledge this right when the question is next presented. *See Burns v. Martuscello*, 890 F.3d 77, 88–93 (2d Cir. 2018); *see also, e.g.*, *Soto v. New Jersey*, No. 17-cv-13450, 2020 WL 2537857, at \*5 (D.N.J. May 19, 2020) (assuming, without deciding, that an inmate's refusal to speak to prison officials is protected by the First Amendment).

## I. The Right Against Compelled Cooperation

Anderson and other prison inmates do not lose the ability to avail themselves of the Constitution's protections merely by virtue of their imprisonment. *See Turner v. Safley*, 482 U.S. 78, 84 (1987) ("Prison walls do not form a barrier separating prison

inmates from the protections of the Constitution."). True, "[t]he fact of confinement and the needs of the penal institution" may justify limitations on a prisoner's constitutional rights when those limitations are "implicit in incarceration." *Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 125 (1977). But when it comes to the First Amendment, "a prison inmate retains those . . . rights that are not inconsistent [1] with his status as a prisoner or [2] with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *cf. Turner,* 482 U.S. at 89 ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."). An inmate's right to refrain from informing on prison guards in the context of a prison investigation is inconsistent with neither.

## A.  Status as a Prisoner

First, nothing about an inmate's "status as a prisoner" inherently limits his right against compelled speech. *See Pell*, 417 U.S. at 822; *cf., e.g.*, *Abu-Jamal v. Price*, 154 F.3d 128, 135 (3d Cir. 1998) (noting that the right to free association is inherently limited in prison). The First Amendment guarantees not only "the right to speak freely," but also "the right to refrain from speaking at all." *Newman v. Beard*, 617 F.3d 775, 780–81 (3d Cir. 2010) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). Coerced speech is a danger that was "well known to the framers of the Bill of Rights," and the right not to speak exists largely to protect from invasion "the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633, 642 (1943).

2

These unconstitutional invasions take the form not just of compelled expressions of opinion, such as saluting a flag (as in *Barnette*) or displaying a state slogan on a license plate (as in *Wooley*), but also of compelled statements of fact. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797–98 (1988); *see Barnette*, 319 U.S. at 642; *Wooley*, 430 U.S. at 717; *see also C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 188 (3d Cir. 2005) ("[T]he law does not hold that a compelled speech violation occurs only in the context of compulsion to embrace a certain viewpoint . . . ."). And while compelled speech in any circumstance is a "severe intrusion on the liberty and intellectual privacy of the individual," *Burns*, 890 F.3d at 84,[1] that intrusion is particularly severe in the context of compelled inmate participation in a prison investigation.

For that reason, the Second Circuit, confronting the same qualified immunity question before our Court today, opted in *Burns v. Martuscello* to recognize a "right not to snitch," notwithstanding its conclusion that the right was not clearly established at the time of the alleged violation. 890 F.3d at 88–95. In so doing, it observed that "[t]he subjects of an informant's reporting either live or work in the same facility where the informant is confined." *Id.* at 91. Given the safety risks this arrangement presents and the fact that providing information about misconduct in a prison is "appreciably more active" and "requires a good deal more of the individual" than certain political gestures,

---

[1] *See* Eugene Volokh, *The Law of Compelled Speech*, 97 Tex. L. Rev. 355, 368 (2018) (noting the Supreme Court's position that "speaker autonomy interests do . . . suffice" to invalidate government action "when [those interests] are sufficiently implicated").

the Second Circuit recognized the "unique burden on the liberty interests of the individual inmate" that compelled cooperation in a prison investigation imposes. *Id.*; *see also Wooley*, 430 U.S. at 715 (recognizing that an affirmative act "involve[s] a more serious infringement upon personal liberties" than a passive act such as displaying a motto on a license plate). In short, instead of reducing an inmate's right against compelled speech, the fact of the prison context may *strengthen* the need for that constitutional safeguard.

### B.      Legitimate Penological Objectives

An inmate's right to refrain from informing on prison guards also is not "inconsistent . . . with the legitimate penological objectives of the corrections system." *Pell,* 417 U.S. at 822. Maintaining security within a corrections facility is a "central" penological objective, *id.* at 823, and the ultimate goal of rooting out misconduct among prison inmates and personnel is no doubt consistent with that objective. But allowing prisons to use forced cooperation as a means of bolstering security, especially when other means of rooting out misconduct are available, would almost certainly have the opposite effect. The hypothetical benefit of compelling an inmate to serve as an informant will, in most cases, be far outweighed by the detriment it causes to inmate safety.

For one, it is well understood that an inmate suspected of "snitching" faces the prospect of life-threatening attacks. *See, e.g.*, *Hamilton v. Leavy,* 117 F.3d 742, 747 (3d Cir. 1997); *Bistrian v. Levi*, 696 F.3d 352, 371 (3d Cir. 2012), *abrogated on other grounds as recognized in Mack v. Yost*, 968 F.3d 311, 319 n.7 (3d Cir. 2020). That safety risk is particularly acute where prison guards have reason to decline to intervene in, to

4

abet, or even to perpetrate such conduct. *See Burns*, 890 F.3d at 91–92 ("[F]orcing an inmate to serve as an informant on an ongoing basis is not reasonably related to a legitimate penological purpose—namely, safety. . . . [F]orcing inmates to serve continuously as snitches may well prompt further violence, as others may seek retribution for perceived betrayals.").

For another, declining to recognize a right against compelled inmate speech—in effect, authorizing prisons to take retaliatory action against inmates who decline to inform on guards or inmates—would countenance a troubling escalation of punitive measures. Without a right to be free from forced participation in investigations, there would be wide berth to the range of coercive tactics prisons could legally use against those who decline to cooperate. And prisons would be expected to reach the outer bounds, given the degree of coercion needed to overcome the fear of being labeled a "snitch." Yet such coercive tactics are precisely the kind of "exaggerated response to prison concerns" against which the Supreme Court has cautioned. *Turner*, 482 U.S. at 90 (quotation marks omitted); *see also Burns*, 890 F.3d at 87 ("[J]ust as a policy may clearly place too great a burden on inmates' rights, so too may a single incident plainly constitute an outsize reaction to prison administration concerns.").

To the extent that public faith in the internal security and orderly functioning of the prison system is relevant to our inquiry, failing to recognize this right also would weaken that faith. "[T]he governance of our criminal justice system, and the methods that may be undertaken in the maintenance of that system, are plainly matters of broad public concern," *Burns*, 890 F.3d at 90, and "society as a whole suffers" when prison

5

officials fail to comply with constitutional principles, *Johnson v. California*, 543 U.S. 499, 511 (2005). Those principles undergird the right against compelled cooperation, which has deep roots in the history and tradition of this Nation. The right traces back to the British government's use of writs of assistance, which allowed government agents to "force third parties to help them" as they searched homes and businesses, "sparked colonial outrage," *Carpenter v. United States*, 585 U.S. 296, 392 (2018) (Gorsuch, J., dissenting), and galvanized the ratification of the Fourth Amendment, *Riley v. California*, 573 U.S. 373, 403 (2014). Indeed, it was "outrage regarding [coercive] investigative methods" that "guided the Framers in crafting the Bill of Rights." *Burns*, 890 F.3d at 90.

While the protections of the Fourth Amendment are, of course, distinct from those of the First Amendment, they inform each other in this context. That is because unlike a member of the public at large, who can refuse to answer questions from law enforcement and "go on his way" under the Fourth Amendment, *Florida v. Royer*, 460 U.S. 491, 497–98 (1983), an inmate's only protection against forced participation in an investigation is his refusal to speak, *see Burns*, 890 F.3d at 91. He cannot, in other words, "go on his way." *Royer*, 460 U.S. at 498. An inmate's First Amendment right against compelled cooperation thus "fits well within a broader frame of constitutional protection from the government's ability to compel participation in investigative measures."[2] *Burns*, 890 F.3d at 91.

---

[2] To the extent the Fourth Amendment informs our analysis here, it is worth noting that allowing prison officials to force an inmate to provide information about illicit activities in the prison could also weaken the inmate's Fifth Amendment privilege against self-

6

## II.    Counterarguments

I take this opportunity to briefly address two counterarguments.

First, Appellees point to the "ancient proposition of law . . . that the public . . . has a right to every man's evidence" as a reason to reject a right against compelled cooperation in a government investigation.  *United States v. Nixon*, 418 U.S. 683, 709 (1974) (second alteration in original) (quotation marks omitted).  But the *Nixon* principle does not apply to "those persons protected by a constitutional, common-law, or statutory privilege."  *Id.* (quotation marks omitted).  A subpoenaed witness, for example, has the ability to contest the subpoena as overbroad or otherwise unconstitutional.  In the prison context, where protections of that sort are "utterly unattainable" for inmates, *Burns*, 890 F.3d at 92, initial silence is—and must be—no different than a judicial challenge to a request to provide testimony.

One might also argue that conditioning favorable prosecutorial treatment on a defendant's cooperation is equivalent to imposing a punishment on an individual who refuses to become an informant.  Not so.  While the government may legally withhold a prosecutorial benefit based on a lack of cooperation by a criminal defendant, *see Roberts v. United States*, 445 U.S. 552, 556–58 (1980), it does not follow that officials may also retaliate against individuals who decline to provide information, *see Burns*, 890 F.3d at 93.  In the latter case, an individual who is not necessarily suspected of any wrongdoing is punished merely because he had the misfortune of being asked for

---

incrimination.  *See McKune v. Lile*, 536 U.S. 24, 36 (2002) ("The privilege against self-incrimination does not terminate at the jailhouse door . . . .").

information and chose not to share it.  Thus, one who refuses to become an informant is "given a choice between snitching or incurring an otherwise [undeserved] punishment." *Id.*  Declining to recognize a right against compelled cooperation in this context pits inmate safety against the First Amendment, undermining legitimate penological objectives and confidence in our penal institutions.  That is the consequence of holding inmates have no right against compulsory service as jailhouse informants, and that holding by the District Court was in error.

*   *   *

In sum, I would "resolv[e] the . . . more difficult question" of whether a constitutional right was violated in this case before granting qualified immunity, *Reichle v. Howards*, 566 U.S. 658, 664 (2012), and, like the Second Circuit, would recognize the existence of a "right not to snitch," at least absent exigent circumstances, *see Burns*, 890 F.3d at 88–93.  As this right is not yet clearly established, however, I join my colleagues in affirming on that basis.